**UNITED STATES of America, Appellee,**

v.

**Edmundo HOWARD–ARIAS, Appellant.**

No. 81–5153.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 8, 1982.

Decided June 1, 1982.

Certiorari Denied Oct. 4, 1982.
See 103 S.Ct. 165.

John C. Lowe, Charlottesville, Va. (Lowe, Gordon, Jacobs & Snook, Ltd., Charlottesville, Va., on brief), for appellant.

Raymond A. Jackson, Asst. U. S. Atty., Norfolk, Va., Laura Everhart, Third Year Law Student (Justin W. Williams, U. S. Atty., Alexandria, Va., on brief), for appellee.

Before HAYNSWORTH, Senior Circuit Judge, and BUTZNER and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

The appellant, Edmundo Howard-Arias was convicted after a jury trial of possession of marijuana on the high seas with intent to distribute it and of possession with intent to import it into the United States under 21 U.S.C. §§ 955a(a) and 955a(d).[1] He was sentenced to consecutive terms of imprisonment, and separate special parole terms were imposed on each count. His appeal challenges certain evidentiary rulings, procedures used during the sentencing phase of his trial, and his multiple convictions and sentences, contending that they violate the double jeopardy clause of the fifth amendment. Finding no merit to his arguments, we affirm.

## I.

Appellant was one of several crew members of the fishing trawler "Don Frank" rescued when their ship became disabled sixty miles off the Virginia coast on December 29, 1980. They were taken aboard an Italian ship, and shortly thereafter units of the United States Coast Guard arrived on the scene. An officer from one of the Coast Guard cutters boarded the wreckage of the "Don Frank" and discovered a large quantity of what was later determined to be marijuana. The Coast Guard cutter "Cherokee" attempted to tow the wreckage to shore, but thirty miles from Norfolk, Virginia, the "Don Frank" foundered and sank. All was not lost however, as approximately 240 bales of the marijuana from the "Don Frank" were salvaged. Upon return to port, the seized material was turned over to Coast Guard and Drug Enforcement Administration (DEA) investigators for testing and storage.

The appellant was indicted on three counts: possession of marijuana with the intent to distribute it while on a vessel subject to the jurisdiction of the United States, conspiracy to distribute marijuana, and possession of marijuana with intent to import it into the United States. Prior to trial, the conspiracy count was dismissed. Howard-Arias was convicted on the remaining two counts and sentenced on each count to a five-year term of imprisonment, a special parole term of three years and a fine of $10,000, the terms of imprisonment to run consecutively.

## II.

The appellant's claims regarding the admission of certain evidence need not long detain us. His first argument is that the government failed to establish a continuous "chain of custody" for the marijuana from the time of its seizure on the seas off the Virginia coast until introduction at trial. It is conceded that one of the DEA agents involved in the transfer and testing of the bales and samples drawn from them did not testify at trial. The Coast Guard officer who seized and tested the marijuana, the officer to whom he surrendered it,

---

1. 21 U.S.C. § 955a(a) provides:
 It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States on the high seas, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

21 U.S.C. § 955a(d) provides:
 It is unlawful for any person to possess, manufacture, or distribute a controlled substance—
 (1) intending that it be unlawfully imported into the United States; or
 (2) knowing that it will be unlawfully imported into the United States.

the DEA custodian at Norfolk, and the DEA chemist all appeared as witnesses. The special agent who received the marijuana from the Coast Guard for transit to the DEA in Norfolk did not.

The "chain of custody" rule is but a variation of the principle that real evidence must be authenticated prior to its admission into evidence. *See* Fed.R.Evid. 901; McCormick, *Handbook on the Law of Evidence* § 213 (2d ed. E. Cleary ed. 1972). The purpose of this threshold requirement is to establish that the item to be introduced, *i.e.*, marijuana, is what it purports to be, *i.e.*, marijuana seized from the "Don Frank." Therefore, the ultimate question is whether the authentication testimony was sufficiently complete so as to convince the court that it is improbable that the original item had been exchanged with another or otherwise tampered with. *United States v. Brewer*, 630 F.2d 795 (7th Cir. 1980). Contrary to the appellant's assertion, precision in developing the "chain of custody" is not an iron-clad requirement, and the fact of a "missing link does not prevent the admission of real evidence, so long as there is sufficient proof that the evidence is what it purports to be and has not been altered in any material aspect." *United States v. Jackson*, 649 F.2d 967 (3d Cir.), *cert. denied,* 454 U.S. 871, 1034, 102 S.Ct. 341, 574, 70 L.Ed.2d 176, 479 (1981); *United States v. Mullins*, 638 F.2d 1151 (8th Cir. 1981); *United States v. Brewer, supra; United States v. Lampson*, 627 F.2d 62 (7th Cir. 1980). Resolution of this question rests with the sound discretion of the trial judge,

and we cannot say that he abused that discretion in this case.

■ Appellant also contends that the district court erred in admitting into evidence a certificate from a Colombian official in order to prove that the "Don Frank" was not registered in Colombia.

Shortly after the seizure by the Coast Guard, Howard-Arias indicated that the "Don Frank" was of Colombian registry and that its journey had originated in Colombia. In an effort to rebut that assertion, the government produced at trial a document from Rear Admiral Avila, the Director General of Maritime and Port Affairs of Colombia, stating that a vessel named the "Don Frank" had been registered in Colombia until April, 1979, but not thereafter. Admiral Avila's signature was attested to as genuine by a series of Colombian officials culminating in the certificate of Colombian Consular Chief Rafael Pena, whose signature was in turn certified by Irving Kanter, an American consular official in Bogota, Colombia. The appellant contends that this document did not conform to the requirements of Fed.R.Evid. 902(3). Once again, he misses the mark. Rule 902 recognizes that the possibility of fraud, forgery and misattribution of certain documents is so slight that the general requirement of authentication by extrinsic evidence, Fed.R.Evid. 901, is dispensed with.[2] Howard-Arias contends that nothing less than a statement by the affiant that he is the official designated to make such certifi-

**2.** Federal Rule of Evidence 902 provides in pertinent part:

Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

. . . . .

(3) Foreign public documents. A document purporting to be executed or attested in his official capacity by a person authorized by the laws of a foreign country to make the execution or attestation and accompanied by a final certification as to the genuineness of the signature and official position (A) of the executing or attesting person, or (B) of any foreign official whose certificate of genuineness of signature and official position relates to the execution or attestation or is in a chain of certificates of genuineness of signature and official position relating to the execution or attestation. A final certification may be made by a secretary of embassy or legation, consul general, consul, vice consul, or consular agent of the United States, or a diplomatic or consular official of the foreign country assigned or accredited to the United States. If reasonable opportunity has been given to all parties to investigate the authenticity and accuracy of official documents, the court may, for good cause shown, order that they be treated as presumptively authentic without final certification or permit them to be evidenced by an attested summary with or without final certification.

cations under Colombian law can satisfy the requirements of Rule 902(3). We do not read the plain language of the rule as embodying such a formalistic requirement. The document offered into evidence purported to be executed, in official capacity, by a Colombian official authorized to make such an execution, and this signature and statement of official capacity was concededly attested to in intermediate and final certifications by various Colombian officials and the American consular officer in Bogota. We perceive no error in this process, nor in the trial court's admission into evidence of the document. *See generally* 5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 902[01] (1978 & 1981 Supp.)

Appellant also contends that the trial court erred in not releasing the probation officer's sentencing recommendation contained in a pre-sentence report, in refusing to allow interrogation of the probation officer and in considering certain information in the report that was "inflammatory" and "false." We do not agree with these contentions.

 Federal district courts are given wide latitude as to the information they may consider in passing sentence after a conviction, *Roberts v. United States*, 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980), and Congress has expressly directed that

> [n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3577. While a defendant has a right to be sentenced only on information that is accurate, *United States v. Lee*, 540 F.2d 1205, 1210 (4th Cir.), *cert. denied*, 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976), this appellant was represented by counsel who highlighted perceived inaccuracies in a timely fashion. The trial judge noted these objections, and he was not required to allow the appellant to present testimony regarding the accuracy of contested portions of the report. Fed.R.Crim.P. 32(c)(3)(A).[3] Likewise, the appellant's claim that the court was required to divulge the contents of the probation officer's sentencing recommendation is meritless, since Rule 32(c)(3)(A) explicitly authorizes the procedure followed by the district court.

### III.

 The appellant's claim that the fifth amendment's double jeopardy provision[4] barred his multiple convictions and multiple sentence requires an excursion into what has been characterized as a "vertible Sargasso Sea" of jurisprudence. *Albernaz v. United States*, 450 U.S. 333, 343, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275 (1981). As stated by the Supreme Court, the double jeopardy clause "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). Thus it is clear that this proscription against subjecting a criminal defendant to double jeopardy extends both to multiple convictions and to multiple punishments for

---

**3.** Fed.R.Crim.P. 32(c)(3)(A) provides:

Before imposing sentence the court shall upon request permit the defendant, or his counsel if he is so represented, to read the report of the presentence investigation exclusive of any recommendation as to sentence, but not to the extent that in the opinion of the court the report contains diagnostic opinion which might seriously disrupt a program of rehabilitation, sources of information obtained upon a promise of confidentiality, or any other information which, if disclosed, might result in harm, physical or otherwise, to the defendant or other persons; and the court shall afford the defendant or his counsel an opportunity to comment thereon and, at the discretion of the court, to introduce testimony or other information relating to any alleged factual inaccuracy contained in the presentence report.

**4.** The fifth amendment's double jeopardy clause provides "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb;".

the same offense. The appellant was twice convicted and twice punished at a *single* trial, and it is an open question in this circuit whether the prohibition against multiple convictions applies only to successive proceedings, or also applies when multiple convictions are entered in a single trial, *see United States v. Buckley*, 586 F.2d 498 (5th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 242 (1979); *Wright v. United States*, 519 F.2d 13 (7th Cir.), *cert. denied*, 423 U.S. 932, 96 S.Ct. 285, 46 L.Ed.2d 262 (1975); *O'Clair v. United States*, 470 F.2d 1199 (1st Cir. 1972), *cert. denied*, 412 U.S. 921, 93 S.Ct. 2741, 37 L.Ed.2d 148 (1973), but it is not necessary to resolve that general issue since we conclude that Congress, in enacting sections 955a(a) and 955a(d) created two separate offenses, thus negating any double jeopardy concerns.

## A.

The key to the double jeopardy problem in this case is deciding whether section 955a(a) and 955a(d) define two separate offenses or whether they merely express different elements of a single offense. The examination of statutory language is inherent in modern double jeopardy cases, *Albernaz, supra*, and is frequently an involved inquiry. Here it is further complicated by the presence of international law concerns and the intent of Congress in treating them.

The appellant contends that, although not so expressly worded, section 955a(a) requires proof of an intent to distribute a controlled substance in the United States. This result, he argues, is required by Congress' examination of, and concern for, international law when it enacted the section. He then argues that this "intention to distribute" after bringing the marijuana *into the United States* overlaps with the proof required for a conviction on the importation count, 21 U.S.C. § 955a(d), and therefore, the two involved sections encompass but one crime. As support for this contention, the appellant advances the test enunciated in *Blockburger v. United States*, 284 U.S.

299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Simply stated, the *Blockburger* rule provides

> that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether these are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Whalen v. United States*, 445 U.S. 684, 691, 100 S.Ct. 1432, 1438, 63 L.Ed.2d 715 (1980). The appellant contends that when this test is applied in this case, the offense defined by section 955a(d) as he construes it "requires no proof beyond that which is required for a conviction" under section 955a(a), and is a lesser included offense. *Brown v. Ohio*, 432 U.S. 161, 168, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187 (1977). If this were true, of course, the dual sentencing would be a violation of the double jeopardy clause.

As Justice Blackmun noted in his concurring opinion in *Whalen, supra*, the historic function of the double jeopardy clause has been as a check on prosecutors and courts, preventing them from bringing more charges, or imposing greater sentences, than the legislature intended. *Id.* 445 U.S. at 697, 100 S.Ct. at 1441. Since the Supreme Court's recent opinion in *Albernaz, supra*, declared that Congress is the final authority on defining federal criminal offenses and on prescribing punishments for their commission, the primary focus of our double jeopardy inquiry in this case is legislative intent. *Id.* 450 U.S. at 337, 101 S.Ct. at 1141.

## B.

■ It is axiomatic that the starting point for any analysis of legislative intent is the language of the statute, as "absent a 'clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" *Albernaz, supra* 450 U.S. at 336, 101 S.Ct. at 1141, *quoting Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Section 955a(a), provides:

It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States on the high seas,[5] to knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance.

Section 955a(d) provides:

It is unlawful for any person to possess, manufacture or distribute a controlled substance—

(i) Intending that it be unlawfully imported into the United States; or

(ii) Knowing that it will be unlawfully imported into the United States.[6]

The plain language of section 955a(a) indicates that its proscriptions against possession of controlled substances apply to any person, whether citizen or foreigner, aboard a ship subject to the jurisdiction of the United States, and section 955b(d) declares that a stateless vessel on the high seas is subject to the jurisdiction of the United States. The bare language of the statute makes it a felony to possess a controlled substance with the intent to distribute it, albeit the intent to distribute might be to do so in some part of the world other than the United States. Section 955a(d) just as plainly requires proof that the possessor of a controlled substance intend or know that it will be imported into the United States.[7] Having explicitly stated this in subsection (d), it can be persuasively argued that had Congress intended that the same element of proof be included in subsection (a), it would have said so.

The defendant argues, however, that if section 955a(a) is interpreted without a "United States connection" it would violate international law and since Congress did not intend to legislate contrary to the es-tablished "law of nations," the proper interpretation is that such possession is a federal crime only if there is proved an intent to distribute the illegal drugs in the United States. According to his view of international law, there is no jurisdiction for the United States to criminalize an act by a noncitizen aboard a stateless vessel on the high seas unless there is a direct connection or "nexus" with the United States. See *United States v. James-Robinson*, 515 F.Supp. 1340 (S.D.Fla.1981). A review of its legislative history, however, reveals that Congress, in enacting section 955a(a) was acutely aware of applicable international law and enacted that provision pursuant to its understanding that the United States had jurisdiction to create a crime proscribing possession of a controlled substance with a general intent to distribute it by any person aboard a stateless vessel upon the high seas.

### C.

The Marijuana on the High Seas Act, of which section 955a(a) is a part, was primarily a creation of the House of Representatives. The Subcommittee on Coast Guard and Navigation of the Committee on Merchant Marine and Fisheries studied the problem of modern narcotics smuggling for several years, and after extensive hearings, presented the underlying bill to the full House which passed it intact. There was no separate Senate bill and the House bill was passed there with minor technical amendments in which the House concurred. The views of the House Subcommittee members under such circumstances, since unambiguous, almost conclusively demonstrate legislative intent. A number of witnesses before the subcommittee expressed the view that the United States should exercise the same criminal jurisdiction over any person

---

**5.** A "vessel subject to the jurisdiction of the United States" is defined by 21 U.S.C. § 955b(d) as including a vessel without nationality or a vessel assimilated to a vessel without nationality, *i.e.* a stateless vessel such as the "Don Frank" in the case *sub judice.*

**6.** This legislation was enacted in an effort to reach drug-smuggling operations involving ves-sels outside the territorial limits of the United States, and to fill a statutory void which resulted from the "inadvertent" repeal of analogous provisions in 1970.

**7.** If the *Blockburger* test is applied to the involved statutes as they are written, there can be no doubt, and the appellant concedes, that the provisions define two distinct offenses.

aboard a stateless vessel on the high seas as it would over a United States citizen. No subcommittee member disagreed with this view—rather, there was near universal support for it.

In a written statement to the subcommittee, the Acting General Counsel of the Department of Transportation stated:

> H.R. 2538 would recognize and take advantage of this broader basis of jurisdiction by making it unlawful for any person aboard a vessel of the United States or a vessel subject to the jurisdiction of the United States, or for any United States citizen aboard any vessel, to possess, manufacture, distribute or dispense a controlled substance.
>
> Thus, the United States may apply its laws regulating possession and distribution of controlled substances on the high seas to: .... (iii) all persons (regardless of their nationality) aboard a vessel which can be treated as stateless....

*Coast Guard Drug Law Enforcement: Hearings Before the Subcomm. Coast Guard and Navigation of the House Comm. on Merchant Marine and Fisheries,* 96th Cong., 1st Sess. 16 (1979) (hereinafter *Hearings* ) (Statement of Mark G. Aron).

The Administrator of the Drug Enforcement Administration echoed these comments when he stated that:

> There is another loophole by which traffickers are circumventing prosecution in the United States. As I mentioned earlier, mother ships are generally manned by foreign nationals. At the present time, it is very difficult to prosecute these crew members; consequently, they only face deportation back to their country. Accordingly, we would fully endorse a legislative proposal that would prohibit any person, not just an American citizen or person on board an American registered vessel, but any person on board any vessel subject to the jurisdiction of the United States, from manufacturing, distributing or possessing with intent to import controlled substances.
>
> Legislation which would enable us to prosecute the crewmen of the trafficking ships which fly no flag and are thus stateless is essential.... We can, under both international and U. S. case law assert this jurisdiction over these vessels, but in order to prosecute the crew, we must first make it a violation of U. S. law to possess large quantities of drugs onboard.

*Id.* at 46 (Statement of Peter Bensinger).

Morris Busby of the Department of State testified that:

> While ordinarily the United States does not favor a unilateral extension of jurisdiction by the United States over the activities of non-U. S. citizens on board stateless vessels without proof of some connection to the United States, the serious nature of this problem, and the fact that persons on board these stateless vessels are engaged in narcotics trafficking aimed at the United States, warrant an extension in this particular case.

*Id.* at 54.

Michael P. Sullivan, Assistant United States Attorney for the Southern District of Florida, speaking to this subject, stated:

> [T]he question must then be addressed whether or not it is an essential element that the distribution would occur within United States territory. If the answer is "yes", that such an intent to distribute necessarily involves an intent to distribute within the United States, rather than some foreign nation, then the new law would be quite useless, as smugglers charged with this new law would just testify that their contraband was to be distributed in Canada, Bermuda, or Europe, anywhere but the United States, just as the defendants in the *Andries* and *Greenwood* case did. Clearly, this law would be no improvement on the present law, since it would be tantamount to requiring the Government to prove an intent to import, which is the present, unsatisfactory situation.

*Id.* at 60.

It is also significant that the Representatives speaking on the bill assumed that the United States had the same jurisdiction

over foreign nationals as it did over United States flagships. In reporting the committee bill to the full House, Chairman Murphy of the House Committee on Merchant Marine and Fisheries stated:

[T]he U. S. has long held that it has the inherent right to exercise extraterritorial jurisdiction over persons committing offenses contrary to our law by virtue of their impact upon our vital national interests....

....

... Following the hearing, the Subcommittee received written reports from the Departments of Justice and Transportation .... reflecting the extent of U. S. ability under international law to prescribe rules of conduct for persons in vessels on the high seas....

....

... The intent to distribute need not be within the United States. Moreover, the intent element may be inferred by proof of a presence of a large quantity of the narcotic or dangerous drug, giving rise to the inference of trafficking.

Congressman Murphy concluded:

*Under this subsection, it would not be necessary to prove that the vessel or the controlled substance was bound for the United States.* Therefore, the proof required for a successful prosecution under this provision would be the same as that required for the same offense within the United States.

H.R.Rep.96–323, 96th Cong., 1st. Sess. 7–12 (1979) (emphasis added).

Finally, Congressman McCloskey, ranking minority member of the Committee, stated on the House floor:

Where current law requires an intent to import a controlled substance into the United States as a necessary element of the crime *this bill essentially requires only knowledge or intent to distribute with no need to establish a U. S. destination.* Such intent may be inferred from the presence of controlled substances that exceed normal consumption—and that

are not entered as cargo on a vessel's manifest.

125 Cong.Rec. H 6380 (July 23, 1979) (emphasis added).

These statements by witnesses before the House Subcommittee and by members of Congress intimately involved with the bill reflect grave concerns over the danger posed to this nation by the increased incidence of modern drug smuggling. It was recognized that the United States is a prime target of these international hoodlums and suffers not only a serious national economic drain, but serious physiological and psychological harm to its citizens. Congress explicitly recognized its right to protect vital aspects of American life, and clearly sought to assert extraterritorial jurisdiction over stateless vessels engaged primarily in "mother ship" smuggling activities involving controlled substances destined almost exclusively for the United States.[8]

■■■ A stateless vessel enjoys little, if any, protection from international law when sailing on the high seas, *United States v. Rubies*, 612 F.2d 397, 403 (5th Cir. 1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980); *United States v. Dominquez*, 604 F.2d 304, 307–09 (4th Cir. 1979), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980); *United States v. Cortes*, 588 F.2d 106, 110 (5th Cir. 1979); *United States v. Angola*, 514 F.Supp. 933 (S.D.Fla.1981), and even if this were not a correct interpretation of international law, Congress conceived it to be a principle of international law and enacted the involved legislation with that understanding. While "international law" is part of this nation's laws, *The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900), "international law must give way when it conflicts with or is superseded by a federal statute ... to the extent permitted by the due process clause of the Fifth Amendment." *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 494 F.Supp. 1161 (E.D.Pa.1980), and the United States may violate international

---

**8.** 21 U.S.C. § 955a(h) provides:

This section is intended to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States.

law principles in order to effectively carry out this nation's policies. *Id.* Congress, therefore, had the power to take jurisdiction over all persons aboard a stateless vessel on the high seas for possession of a controlled substance with an intent to distribute it anywhere and it clearly intended section 955a(a) to have that meaning. Prosecutions for possession of controlled substances prior to the enactment of the Marijuana on the High Seas Act required proof of intent to distribute the illegal drugs within the United States. The very intent of the Marijuana on the High Seas Act was to eliminate that requirement and to facilitate prosecution of smugglers both native and foreign who were apprehended on the high seas. Congress intended to create one crime for possession with intent to distribute and another for possession with intent to import into the United States, and the district court's action in sentencing the appellant under both sections did not violate the double jeopardy clause of the fifth amendment.

AFFIRMED.