UNITED STATES of America, Appellee,

v.

Alberto Erlington
PENA–JESSIE, Appellant.

UNITED STATES of America, Appellee,

v.

Luis Felipe
MOYA–CORDOBA, Appellant.

Nos. 84–5057(L), 84–5059.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 7, 1984.

Decided June 3, 1985.

---

John T. Wainwright, Washington, D.C., William P. Robinson, Jr., Norfolk, Va. (James B. Power, Norfolk, Va., on brief), for appellants.

Tommy E. Miller, Asst. U.S. Atty., Norfolk, Va. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., on brief), for appellee.

Before PHILLIPS, SPROUSE and SNEEDEN, Circuit Judges.

SPROUSE, Circuit Judge.

Alberto Erlington Pena-Jessie and Luis Felipe Moya-Cordoba appeal their conviction by a jury of possession of marijuana

on the high seas for the purpose of importation, 21 U.S.C. § 955a(d) (1982), and conspiracy to possess marijuana for the purpose of importation, 21 U.S.C. § 955c (1982). We affirm.

Pena-Jessie was the captain and Moya-Cordoba the first mate of the "T-Grit," a 95-foot fishing vessel of Panamanian registry. The Coast Guard observed the "T-Grit" approximately 270 miles off the coast of South Carolina on August 2, 1982. Flying no flag, the "T-Grit" was running low in the water and displayed no fishing gear. The next day the Coast Guard sighted the vessel within 45 miles of the coast of the United States and dispatched a vessel to maintain surveillance. Coast Guard Lt. Monaghan radioed for permission to board the "T-Grit," and Pena-Jessie granted it. In addition, Lt. Monaghan received word from the State Department that the government of Panama issued a "statement of no objection" permitting U.S. officials to board the "T-Grit."

After boarding the vessel, Lt. Monaghan examined the "T-Grit's" documents. He then attempted to locate the main beam number, an identification number, to determine whether it matched the number stated in the documents. While searching for the beam number, Lt. Monaghan noticed that there was no entrance to approximately 50 percent of the below deck space forward of the engine room. He further observed a fresh cement patch on the deck, equipment for the installation or removal of tiles, and differing tiles that were pieced together over the inaccessible area of the hold. Lt. Monaghan ordered that a hole be cut into the superstructure of the "T-Grit" above the sealed compartment. Once this hole was cut, he smelled marijuana and subsequently took samples which confirmed the find.

While the hole was being drilled, Lt. Monaghan observed Pena-Jessie and Moya-Cordoba near a radio in the pilot house of the "T-Grit." Lt. Monaghan testified that Pena-Jessie used the radio while Moya-Cordoba sat near it listening. A technician on a nearby Navy vessel intercepted their message and translated it: "They are breaking us up, they are taking us to land."

Thereafter, all of the fourteen crew members were taken into custody and transported by the Coast Guard to Portsmouth, Virginia. All of the crew members, except Pena-Jessie and Moya-Cordoba, were released and returned to their native Columbia. The seized marijuana was turned over to the Drug Enforcement Agency which found it to weigh approximately 28,000 pounds with a wholesale value of $7 million and a retail value of $12 million.

Pena-Jessie and Moya-Cordoba testified that they were hired by one Jose Cruz and that the vessel's compartment was already sealed when they boarded the "T-Grit." They testified that they were enroute to Canada to assist another company-owned vessel which had become disabled in Canadian waters. Certain charts found in the pilot house, however, showed track lines to the coast of North Carolina.

Pena-Jessie and Moya-Cordoba contend that the district court lacked jurisdiction to try the case because they were foreign nationals aboard a foreign ship at the time of the arrest and that the Coast Guard violated U.S. and international law in boarding the "T-Grit"; that the seizure of the marijuana violated their rights under the Fourth Amendment; that a diplomatic note was improperly admitted into evidence; that the district court erred in charging the jury concerning conspiracy; and that there was insufficient evidence to support the conviction of conspiracy or to support Moya-Cordoba's conviction of possession of marijuana.

 Pena-Jessie and Moya-Cordoba claim that because they were foreign nationals on a foreign vessel, the seizure of the "T-Grit" violated 19 U.S.C. § 1581(h) (1982) and article 6 of the Convention on the High Seas, April 12, 1961, 13 U.S.T.

2312, T.I.A.S. No. 5200, 450 U.N.T.S. 82.[1] Article 6 of the High Seas Convention declares the exclusivity of a nation's jurisdiction over ships which fly its flag: "Ships shall sail under the flag of one state only and ... shall be subject to its exclusive jurisdiction on the high seas." The Convention is a codification of established principles of international law. *United States v. Williams,* 617 F.2d 1063, 1090 (5th Cir. 1980) (en banc). So, although Panama is not a signatory to the High Seas Convention, it has "article 6" rights under common law. *Id.* Nevertheless, we agree with the holding of the Fifth Circuit in *Williams:*

> Panama's consent to the search constituted a waiver of any such common law rights. It makes no difference that those aboard the PHGH were not parties to Panama's consent, since rights under international common law must belong to sovereign nations, not to individuals, just as treaty rights are the rights of the sovereign. Thus, Panama's waiver of its common law rights completely removed any international law concerns from the case.

*Id.* (footnote omitted). Here, by giving U.S. officials permission to board the "T-Grit," Panama waived these rights and article 6 did not divest the district court of jurisdiction.

■ Furthermore, 21 U.S.C. §§ 955a(d), 955c, sections of the Marijuana on the High Seas Act under which the defendants were convicted, supercede the High Seas Convention because the Act became law on September 15, 1980, after the date of the ratification of the Convention. *United States v. Postal,* 589 F.2d 862, 878–79 n. 25 (5th Cir.), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). In another section of the Act, Congress stated that "[t]his section is intended to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States." 21 U.S.C. § 955a(h) (1982). We have recognized that in the Marijuana on the High Seas Act Congress intended to exercise the maximum possible criminal jurisdiction over drug smugglers. *United States v. Howard-Arias,* 679 F.2d 363, 368–72 (4th Cir.), *cert. denied,* 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982).

■ Contrary to the appellants' contention, we think that the Coast Guard did not violate 19 U.S.C. § 1581(h) which simply provides that statutory provisions allowing U.S. officials to board vessels on the high seas shall not apply to a foreign vessel in contravention of any treaty with a foreign government except as specially arranged with the foreign government. Panama granted U.S. officials permission to board the "T-Grit" thereby satisfying the "special arrangement" requirement of section 1581(h).

■ Appellants, however, argue that the government did not properly prove compliance with article 6 of the Convention or 19 U.S.C. § 1581(h). They contend that the district court improperly admitted the diplomatic note demonstrating Panama's grant of permission. We think, however, that the note was properly admitted under Fed.R.Evid. 902(3).

We perceive no merit to the other claims of the defendants, and the judgment of the district court is

AFFIRMED.

---

**1.** The appellants challenge neither Congress' authority to proscribe extraterritorial conspiracies by foreign nationals on board a foreign vessel under 21 U.S.C. §§ 955a(d), 955c, nor the power of the United States to enforce such proscriptions.