**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                            No. 96-4831

DONALD WARDRICK,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                            No. 96-4908

PORTEAL GROOM,
Defendant-Appellant.

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CR-95-294-PJM)

Argued: December 5, 1997

Decided: April 13, 1998

Before MURNAGHAN, HAMILTON, and MICHAEL,
Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Mark Jeffery Kadish, LAW FIRM OF MARK J. KAD-ISH, Atlanta, Georgia, for Appellant Groom; Edward Smith, Jr., Baltimore, Maryland, for Appellant Wardrick. David Ira Salem, Assistant United States Attorney, Stephen S. Zimmerman, Assistant United States Attorney, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Lynne A. Battaglia, United States Attorney, Greenbelt, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Donald Wardrick and Porteal Groom were convicted in the District of Maryland for conspiracy to distribute heroin, 21 U.S.C. § 846, possession of heroin with the intent to distribute it, 21 U.S.C. § 841, and importation of heroin, 21 U.S.C. §§ 952, 963. The defendants appeal their convictions, challenging several rulings and determinations made by the trial court. Groom also appeals a three-level enhancement imposed by the court at sentencing. Finding no reversible error, we affirm.

I.

Wardrick and Groom were part of an international heroin smuggling enterprise which used young Americans as couriers to transport the drug from Pakistan into the Washington, D.C. area. The story in this case began in July 1994, when Minerva Mojica ran into her old boyfriend, Donald Wardrick, while vacationing in Atlantic City, New Jersey. Wardrick asked Mojica if she knew some people who would be willing to "go out of town" and "make some money." Mojica talked with two of her friends, Michael Sirianni and Jennifer Heitzen-

rater, who said that they were interested. Thereafter, in October 1994 Wardrick and Mojica met with Sirianni and Heitzenrater in Maryland for initial discussions about the assignment. Wardrick informed Sirianni and Heitzenrater that they would be traveling to Pakistan as couriers. Details came later. Wardrick arranged for passports and visas for Sirianni and Heitzenrater. Wardrick gave them $5,000 for traveling expenses, and he paid each of them $2,500, one half of the fee for making the trip. Wardrick also gave them a set of new empty suitcases to take along. Sirianni and Heitzenrater were instructed to fly to the Pakistani border town of Lahore by way of Karachi and Islamabad, and they were to stay at a hotel in Lahore called Falletti's. They were told to wait at Falletti's until they were contacted by a man named Mateen, who would exchange suitcases with them. They would then bring Mateen's suitcases back to the United States and give them to Wardrick. When they asked what they would pick up in Pakistan, Mojica told them that it was "best that they didn't know." Sirianni and Heitzenrater made the trip in November 1994, and everything occurred as Wardrick had planned. Upon their return to the United States, the couriers met Wardrick and Mojica in Atlantic City. The four then drove to Maryland, where Heitzenrater turned the suitcases full of drugs over to Wardrick.

In the meantime, Wardrick had introduced Mojica to Porteal Groom, who told her that he had made the journey to Pakistan himself on a prior occasion. Wardrick later told Mojica that he and Groom were partners who had invested in an earlier trip which had fallen through because the heroin "wasn't right or something."

Wardrick contacted Sirianni again in December 1994 to recruit other couriers to make the same trip to Pakistan, again for the same fee. Sirianni contacted three of his friends, who made a trip in January of 1995. At Wardrick's request, Sirianni also located three couriers for a third trip in July 1995. The arrangements for the third trip were the same as before, except that the exchange of suitcases was to take place at the Kabana Hotel in Lahore rather than Falletti's. The three couriers successfully completed the first part of the assignment, but they were stopped by Pakistani Customs at Karachi Airport on their way home. Pakistani Customs Inspector Abrar Ahmed detected bulges in the lining of the suitcases carried by the couriers. When he cut the linings open, he found 139 polythene bags containing 12 kilo-

3

grams of an off-white powdery substance. Ahmed field-tested the substance, determined that it was heroin, and arrested the three couriers. The drugs were kept in a government evidence warehouse in Karachi until the next day when Ahmed forwarded samples to the Pakistani National Health Laboratory in Islamabad. There, a government chemist tested the samples and confirmed that they contained heroin.

While being interrogated by Pakistani Customs, the couriers revealed that they were to meet Sirianni at JFK Airport in New York City. They also implicated Wardrick and Mojica. The Customs official, Javaid Mughal, notified United States DEA agents in Pakistan, who in turn contacted their colleagues at home. DEA agents apprehended Sirianni at the Pakistani International Airlines terminal at JFK while he was waiting for the couriers to arrive. Sirianni thereafter agreed to cooperate with the authorities.

The DEA used Sirianni to arrange a controlled delivery of the heroin-laden suitcases at a Maryland hotel on July 13, 1995. One of the DEA agents paged Wardrick using a code Sirianni had previously used to get in touch with him. Wardrick and Mojica were together on the evening of July 13 when Wardrick received the pages. Wardrick told Mojica at that time that he had to meet Groom to talk about Sirianni. At about 10:30 that night, Wardrick and Mojica drove to the hotel where Sirianni and the DEA were waiting. Groom came to the hotel in a separate car. The agents observed Groom shifting from location to location around the parking lot, performing what appeared to be counter-surveillance. Groom made 39 cellular phone calls in four hours, including eight to Wardrick's pager number. Groom also called the cellular phone number of the heroin contact in Pakistan from a nearby pay phone.

Wardrick instructed Mojica to call Sirianni from a pay phone and ask him to come out and talk. Following instructions from the DEA, Sirianni refused to leave his room, feigning illness. After a delay, Sirianni came out of the hotel with the suitcases, placed them on the sidewalk and returned inside. Upon Wardrick's instructions, Mojica was to put the suitcases in a taxi in front of the hotel; she was to ride in the taxi for a few blocks, meet Groom (who would be following) and give the heroin to him. Mojica got no further than placing the suit-

4

cases into a taxi. At that point, Mojica, Groom and Wardrick were arrested. Mojica later decided to cooperate with the authorities.

Wardrick and Groom were indicted, and trial was set for January 9, 1996. On December 15, 1995, the government was granted a continuance (trial did not begin until May 21, 1996) because the prosecution was taking steps to obtain evidence from the Pakistani government. Thereafter, Wardrick's motion to dismiss for violation of the Speedy Trial Act was denied.

At trial the government sought to introduce hotel records confirming the couriers' stay in Lahore. These records were admitted over Wardrick's objection that they were not properly authenticated as foreign documents. The district court also admitted testimony about the heroin seized in Pakistan over defense objection that the government could not show an adequate chain of custody for the drugs. In addition, the court permitted expert testimony by Johnny Brown, a narcotics consultant with the District of Columbia police department, who testified about the methods of drug traffickers, including the use of cellular phones and pagers.

Mojica also testified against Wardrick. While Mojica was in jail awaiting trial, Mojica was shown a letter from Wardrick instructing her to testify that Sirianni was "the man," that is, the person in charge of the heroin operation. Mojica told the jury about the contents of this letter. At the time, the court gave the jury a cautionary instruction, stating that Mojica's testimony was admissible to show Wardrick's criminal intent but that it was not admissible against Groom. When Mojica unexpectedly testified that it was Groom and not Sirianni who was "the man," the court repeated its cautionary instruction. The court, however, denied Groom's motion for a severance.

Wardrick and Groom were convicted of conspiracy to distribute heroin, possession with intent to distribute, and importation of heroin. At sentencing Groom received an enhancement under § 3B1.1 for exercising management and supervisory responsibility in the conspiracy. Wardrick and Groom now appeal their convictions, and Groom appeals his sentence.

5

II.

A.

Wardrick first argues that the district court erred in admitting register entries and guest charges from the Pakistani hotels where the couriers stayed. This evidence was admitted to place the couriers together at the specific Pakistani hotels designated by Wardrick. Wardrick argues that by failing to authenticate these records through the foreign records certification procedure mandated by 18 U.S.C. § 3505, the government forfeited the opportunity to introduce them at trial.

Section 3505 provides that a foreign record of a regularly conducted activity shall not be excluded as hearsay if a foreign certification attests that:

> (A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

> (B) such record was kept in the course of a regularly conducted business activity;

> (C) the business activity made such a record as a regular practice; and

> (D) if such record is not the original, such record is a duplicate of the original.

§ 3505(a)(1). A proper "foreign certification" requires a written declaration by the custodian or "another qualified person" which subjects the declarant to criminal penalty for falsification under the laws of the foreign country. See § 3505(b) & (c)(2).

Here, each hotel custodian wrote the word "attested" and signed his name on each page of the records. This, however, provided no real indication that the hotel custodians were aware of or able to certify that the records complied with the requirements of § 3505(a)(1)(A)-(D). As a result, the government offered the live testimony of Paki-

6

stani Customs Agent Mughal, who testified to each of the four statutory requirements. The government argues that Mughal was "another qualified person" under the statute because he had visited the hotels and met with the custodians. Thus, according to the government, Mughal became sufficiently familiar with the hotels' record keeping systems to be able to lay a proper foundation for admissibility under § 3505.

The government relies on United States v. Hathaway, 798 F.2d 902 (6th Cir. 1986), a case in which an FBI agent's testimony that he was familiar with the record keeping system of a corporation was sufficient to authenticate the business records under the analogous business records exception to the hearsay rule. See id. at 906; see also United States v. Franco, 874 F.2d 1136, 1139-40 (7th Cir. 1989) (holding that agent's "thorough description of the bookkeeping process" qualified him to authenticate business records under Rule 803(b) despite not being custodian).

In this case, Mughal testified that he went to the hotels "a couple of times" and was told that these records were made in the ordinary course of business. We recognize that evidentiary rulings on the admission of business records are left to the sound discretion of the district court, and such rulings should be overturned only if the court abused its discretion. See Franco, 874 F.2d at 1140. We are not convinced that Mughal's testimony demonstrated a sufficient familiarity with how records were kept at the hotels for him to pass muster as a "qualified person" under the statute. His testimony does not reveal the thorough understanding of a record keeping system that courts require before an outsider can authenticate records. Accordingly, we conclude that Mughal was not a qualified witness who could provide a foreign certification under § 3505, and the hotel records were improperly admitted.

Although the district court did err in admitting these records, its error was harmless. The hotel records were offered for a very limited purpose: to place the couriers together in Pakistan at hotels designated by Wardrick. There is other evidence to connect the three couriers with Pakistan, most notably their arrest there with heroin in their possession. Furthermore, Mojica and Sirianni testified that Wardrick instructed his couriers to go to these hotels in Lahore in order to pick

7

up the drugs. Given the weight of this other evidence, the documentary evidence that the couriers signed registers and incurred charges at two specific hotels in Pakistan fades in significance. Accordingly, the district court's error in admitting the hotel documents under § 3505 was harmless.

B.

Wardrick further argues that the district court erred when it admitted into evidence testimony that the packets of off-white powder taken from the couriers in Pakistan contained heroin. He argues that because the government failed to produce a witness from the Pakistani evidence warehouse, the chain of custody was broken between the customs official who seized the contraband at the Karachi airport and took it to the evidence warehouse and the National Health Laboratory which received samples of the substance by messenger and determined it to be heroin.

A determination by the trial court that an adequate chain of custody has been established is reviewed for an abuse of discretion. See United States v. Ricco, 52 F.3d 58, 61 (4th Cir. 1995). We have said that:

> precision in developing the "chain of custody" is not an iron-clad requirement, and the fact of a missing link does not prevent the admission of real evidence, so long as there is sufficient proof that the evidence is what it purports to be and has not been altered in any material aspect.

United States v. Howard-Arias, 679 F.2d 363, 366 (4th Cir. 1982) (citations and internal quotation omitted). In Howard-Arias the prosecution failed to produce the DEA agent who transported bales of marijuana seized from a disabled boat to a DEA testing laboratory. It did produce the Coast Guard officer who seized the marijuana, the officer to whom he surrendered it, the DEA custodian at the laboratory and the DEA chemist who tested the marijuana. We held that the purpose of the chain of custody requirement is merely to "convince the court that it is improbable that the original item has been exchanged with another or otherwise tampered with." Id. Even though the one DEA

8

agent did not testify, we held that the district court did not abuse its discretion in admitting the evidence. See id.

Here, the chain of custody of the heroin seized in Pakistan is sufficiently clear from the testimony presented at trial. Pakistani Customs Inspector Ahmed, who seized the heroin from the couriers, testified that he hand-carried the substance to the evidence warehouse. He further testified that the next day he sent samples of the contraband by messenger to the National Health Laboratory. Mohammed Rajput, a chemist at the Laboratory, testified that he received the evidence intact and determined it to be heroin. Customs Agent Mughal testified that he personally obtained more samples from the bags of heroin in the evidence warehouse and gave it to DEA Agent Lowe. Agent Lowe testified that these same samples were placed in sealed DEA evidence envelopes in Pakistan and that the envelopes were transported to the United States by diplomatic pouch. The DEA chemist testified that the envelopes were sealed when he received them. The only missing link in the chain of custody is between the warehouse and the Pakistani National Health Laboratory. We find this virtually indistinguishable from Howard-Arias, where a missing link (the agent who received the marijuana from the Coast Guard and transported it to the DEA lab) did not prohibit the introduction of the drugs. Accordingly, we conclude that the district court did not abuse its discretion in concluding that the chain of custody was sufficient to admit into evidence the testimony that the powdery substance seized from the couriers in Karachi was heroin.

C.

Mojica testified that while in jail awaiting trial a woman visited her and showed her a letter from Wardrick. This letter, which had been handwritten by Wardrick, instructed Mojica to implicate Sirianni as "the man," that is, head of the heroin conspiracy. Mojica testified that this was an attempt to persuade her to perjure herself because Groom, not Sirianni, was the person in charge. Id. Wardrick challenges the admission of Mojica's testimony about the contents of this letter for purposes of establishing his guilt.

Over a century ago the Supreme Court held that an attempt to cause a witness to perjure herself was itself evidence that "tend[s] to show

9

guilt." See Wilson v. United States, 162 U.S. 613, 621 (1896). We have held that an attempt by a defendant to tamper with a witness is admissible to show the defendant's criminal intent. In United States v. Reamer, 589 F.2d 769 (4th Cir. 1978), the defendant met privately with government witnesses prior to their trial testimony. Those witnesses thereafter disavowed previous statements made to federal agents. We upheld a jury instruction saying "if the jury found that the defendant attempted to suppress evidence, it could consider such evidence against him on the issue of consciousness of guilt." Id. at 770. Here, Mojica testified that Wardrick told her in his letter to perjure herself and implicate Sirianni (another conspirator cooperating with the government) as the ringleader. In light of Wilson and Reamer the district court did not abuse its discretion in admitting testimony on the content of the letter as evidence of Wardrick's criminal intent.*

Groom also takes issue with the admission of the contents of the letter, although for a different reason. He argues that the prosecution improperly used Mojica's testimony about Wardrick's letter to implicate Groom, despite the judge's instruction that the jury could only consider the letter as evidence against Wardrick. Groom suggests that the letter telling Mojica to lie, combined with her testimony implicating Groom as "the man," constituted a statement by a codefendant (Wardrick) that implicated Groom. This, according to Groom, violated Bruton v. United States, 391 U.S. 123 (1968). In Bruton the Supreme Court held that a defendant's Sixth Amendment right of confrontation is violated when he is inculpated by a non-testifying codefendant's prior statement. The Court held that such evidence should not be admitted because the codefendant "cannot be tested by cross-examination" without violating his Fifth Amendment rights. In such situations, the trial court must either redact the codefendant's statement or order a severance. See id. Groom argues that the district court violated Bruton when it denied his motion for a severance.

---

* Wardrick also argues that permitting Mojica to testify as to the content of the letter violated the best evidence rule. Since the evidence showed that the letter remained in the possession of one of Wardrick's confederates (the woman who visited Mojica at the jail), and since Mojica was available for cross-examination on the contents of the letter, this argument has no merit.

10

In United States v. Campbell, 935 F.2d 39 (4th Cir. 1991), three persons (Campbell, Best, and Gadson) were involved in a crack distribution conspiracy. When Campbell was arrested, he spontaneously stated that he had "gotten crack cocaine from Best." Id. at 43. At trial Best cooperated with the government and testified to Gadson's role in the conspiracy. Gadson argued that Campbell's post-arrest statement (which was admitted at trial), combined with Best's testimony, constituted a violation of Bruton. We rejected this argument because "[s]tanding alone, Campbell's statement did not incriminate Gadson. If the statement did incriminate Gadson in the manner he contends, it is only because Best testified to Gadson's involvement in the conspiracy." Id. Since Best was available for cross-examination, Gadson's right of confrontation was not violated. See id.; accord United States v. Locklear, 24 F.3d 641, 646 (4th Cir. 1994).

The facts in this case are similar to those in Campbell. Wardrick's letter did not refer to Groom in any way. It referred to Sirianni. The only possible connection to Groom is Mojica's testimony at trial. Mojica, of course, was available for cross-examination on her statement that Groom was "the man." Therefore, Groom's right to confrontation was not violated. Furthermore, the district court gave a strong prophylactic instruction before Mojica's testimony, admonishing the jury not to consider Mojica's testimony against Groom, and repeating it after she was finished. Compare Locklear, 24 F.3d at 646 & n.2 (questioning whether limiting instruction was necessary in similar situation). We therefore cannot say that the court abused its discretion in denying Groom's motion for a severance.

D.

Groom also challenges a three-level enhancement he received for being a manager or supervisor in the conspiracy. Section 3B1.1 of the Sentencing Guidelines provides for a three-level enhancement for a defendant who "was a manager or supervisor (but not an organizer or leader)." U.S.S.G. § 3B1.1(b). The Application Note for this section sets forth the test to be used in determining whether a defendant was a manager or supervisor:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the

11

> commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Id. App. Note 4. The district court's determination of a defendant's management or supervisory role may only be reversed if clearly erroneous. See United States v. Hyppolite, 65 F.3d 1151, 1159 (4th Cir. 1995).

In its factual findings at sentencing, the district court found that Groom played a coordinating role in the heroin smuggling operation. The court based this finding on evidence that Groom was Wardrick's "partner" and that Groom made a number of phone calls to a heroin contact in Pakistan while waiting for a delivery of drugs from Sirianni outside a hotel in Maryland. Furthermore, Mojica testified that when she was suspicious as to Sirianni's reluctance to meet her, she looked to Groom for direction. From these facts, the court concluded that Groom played a managerial or supervisory role in the conspiracy. This was not clearly erroneous, so we affirm Groom's sentence.

E.

Wardrick also presented several other arguments. Because we find them to be without merit, we will be brief in disposing of them.

1.

Wardrick claims that he was denied his right to a speedy trial because the district court granted a continuance in order to permit the government to obtain evidence from Pakistan. The Speedy Trial Act permits a criminal trial to be delayed up to one year if "an official request . . . has been made for evidence . . . in[a] foreign country." 18 U.S.C. § 3161(h)(9). The Act refers to a different section, 18 U.S.C. § 3292, for the definition of the term"official request." That term is defined as:

> a letter rogatory, a request under a treaty or convention, or any other request for evidence made by a court of the

United States or an authority of the United States having criminal law enforcement responsibility, to a court or other authority of a foreign country.

Section 3292(d) (emphasis added). Determinations of excludable time are reviewed for clear error. See United States v. Revis, 48 F.3d 763, 770 (4th Cir. 1995).

Here, the government requested and received a continuance in order to obtain evidence, namely drugs and packaging held by a Pakistani court. See JA at 44. This request was made to a Pakistani prosecutor on December 14, 1995, by telephone in an effort to shortcut the more formal (and time consuming) diplomatic procedure of obtaining a letter rogatory. The request by telephone is sufficient to constitute an official request under § 3292, and the district judge did not err in granting the government's motion for a continuance based on this official request. The Speedy Trial Act permits the period (up to a year) of such a continuance to be excluded. Wardrick was not denied a speedy trial under the Act because his trial began within about five months of December 15, 1995, the date the continuance was granted.

2.

Wardrick further complains about background testimony on the heroin trade. Specifically, he points to the testimony of Johnny Brown, who testified that drug traffickers frequently use pagers, cellular phones and phone cards for communication. This testimony, Wardrick argues, was impermissible character evidence.

We have repeatedly endorsed the use of expert testimony to illustrate the methods of drug trafficking, see, e.g. , United States v. Gastiaburo, 16 F.3d 582, 589 (4th Cir. 1994), and we have specifically allowed testimony on the use of cellular phones and pagers by drug traffickers, see United States v. Brewer , 1 F.3d 1430, 1436 (4th Cir. 1993). Furthermore, Brown was careful to indicate that simply carrying cellular phones or pagers is not evidence of guilt, noting that he carried a pager himself. The district court did not err in admitting Brown's testimony.

13

3.

Wardrick also argues that a note from the jury, delivered along with the verdict, showed that the verdict was tainted. The note read: "We have great concern for our safety, leaving the courthouse. Do we have to report back to the Clerk's office?" The trial court responded to this concern as follows:

> THE COURT: With regard to your concern, I have, as I say, no reason to belief [sic] that anything that's happened untoward in this case, but in order to reassure you, what I've arranged is I will ask everyone in the courtroom to remain here, and you will be escorted to your cars by the marshals.
> . . .

> I would ask the forelady, if you would step up, forelady and counsel, if you will.

> (At the bench)

> THE COURT: Madam Forelady, thank you for your service. I had talked to counsel. I want to be sure no one has made any sort of approach to any of the jurors, as far as you know?

> THE FOREPERSON: They have not.

> THE COURT: They have not. This was just a general concern?

> THE FOREPERSON: Correct.

Wardrick suggests that this concern for safety tainted the verdict, and that the district court erred by not making further inquiry into the issue.

Defense counsel did not object to the trial court's handling of the issue at the time. Accordingly, we review the issue for plain error. See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 731-32

14

(1993). Wardrick must therefore show that the trial court erred, that the error was plain, and that it affected his substantial rights. Even if these factors were satisfied, we will not exercise our discretion to correct the error unless it "seriously affected the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 732 (citation and internal quotations omitted). Wardrick cannot point to anything even suggesting that the jury's general safety concern had any effect on the verdict. Nor does he demonstrate that the jury was influenced by an improper motive in finding him guilty. We see no error at all in the way the district court handled the jury's note.

III.

For the foregoing reasons, the convictions of Wardrick and Groom are affirmed, and Groom's sentence is affirmed.

AFFIRMED

15