**UNITED STATES, Appellant and Cross-Appellee,**

v.

**Raul S. ORTIZ, Jr., Airman First Class, U.S. Air Force, Appellee and Cross-Appellant.**

No. 48,120.
ACM 23910.

U.S. Court of Military Appeals.

June 15, 1987.

For the United States: *Colonel Kenneth R. Rengert, Major Robert E. Ferencik, Jr., Captain Robert S. Schwartz* (on brief).

For the Accused: *Colonel Leo L. Sergi* and *Major Conrad C. Baldwin, Jr.* (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

This case parallels *United States v. Johnson,* 24 M.J. 101 (C.M.A.1987). Airman Ortiz was tried for sabotage of an Air Force F-15 aircraft, in violation of 18 U.S.C. § 2155, as incorporated by Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934, and for willful damage to the same aircraft in violation of Article 108, 10 U.S.C. § 908,[1] Contrary to his pleas, he was convicted by a military judge sitting alone as a general court-martial; and he was sentenced to a bad-conduct discharge, confinement for 1 year, partial forfeitures of pay for 8 months, and reduction to airman basic. The convening authority approved these results.

Upon review, the Court of Military Review disapproved the sabotage conviction in reliance on the opinion rendered previ-

---

1. The language of the allegations was:

CHARGE I: Violation of the Uniform Code of Military Justice, Article 108.
Specification: In that AIRMAN FIRST CLASS RAUL S. ORTIZ, JR., United States Air Force, 21st Aircraft Generation Squadron, did, at Elmendorf Air Force Base, Alaska, on or about 11 November 1982, without proper authority, willfully damage by disconnecting a relay located in the bay of panel 48L, a U.S. Air Force F-15 aircraft, Tail Number 74-081, military property of the United States, the amount of said damage being less than $50.00.

CHARGE II: Violation of the Uniform Code of Military Justice, Article 134.
Specification: In that AIRMAN FIRST CLASS RAUL S. ORTIZ, JR., United States Air Force, 21st Aircraft Generation Squadron, did, at Elmendorf Air Force Base, Alaska, on or about 11 November 1982, willfully injure by disconnecting a relay located inside the bay of panel 48L, a U.S. Air Force F-15 aircraft, Tail Number 74-081, National Defense material of the United States, with the intent to interfere with the national defense of the United States in violation of Title 18 U.S.C., Section 2155.

ously by that court in *United States v. Johnson*, 15 M.J. 676 (A.F.C.M.R.1983); and Judge Snyder dissented as he had done in *Johnson*. [2] However, upon reassessment of sentence, the court below concluded that the sentence adjudged at trial was appropriate and affirmed it.

The Judge Advocate General of the Air Force certified to this Court the same two issues that he had certified in *Johnson*:

DID THE AIR FORCE COURT OF MILITARY REVIEW EMPLOY AN IMPROPER LEGAL STANDARD IN REACHING ITS FINDINGS THAT THERE WAS INSUFFICIENT PROOF OF INTENT TO COMMIT SABOTAGE AS THAT INTENT IS DEFINED IN 18 U.S.C. § 2155?

IF THE ANSWER TO THE FOREGOING IS IN THE AFFIRMATIVE, SHOULD THE CASE BE REMANDED TO THE COURT OF REVIEW FOR RECONSIDERATION OF THE ADEQUACY OF PROOF OF INTENT, BASED UPON PROPER CRITERIA?

As in *Johnson*, the accused cross-petitioned for review; we granted review of this issue specified by the Court:

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW'S REASSESSMENT OF THE SENTENCE WAS ERRONEOUS AS A MATTER OF LAW IN LIGHT OF THE MAXIMUM PUNISHMENT FOR DAMAGE TO MILITARY PROPERTY IN AN AMOUNT LESS THAN $50.00 LISTED IN THE TABLE OF MAXIMUM PUNISHMENTS.

I

Ortiz was a maintenance crew chief at Elmendorf Air Force Base, Alaska, where he worked on F–15s like the one involved in this case. In all, 27 F–15s were assigned to the accused's unit; and their mission was described by a government witness, Captain Jimmy L. Harris, in this colloquy:

Q: ... What overall is the mission of the F–15s assigned here at Elmendorf?

A: For air superiority, or the defense of the United States basically.

Q: What portion of the defense of the United States?

A: Okay. Our primary job as an F–15 squadron and/or wing is to intercept anyone that either encroaches upon the United States, or if in real time, it would be—missiles were starting to come over, we would be scrambled off of Elmendorf and the various sites in order to intercept the enemy, being defined as whoever that is at the particular time.

At about 6:30 a.m. on November 11, 1982, Ortiz began preparing aircraft 74–081 for a training sortie, which included an overflight of a Veteran's Day parade in Anchorage, Alaska. The aircraft was not armed for combat, although within 15 minutes it could have been. About an hour later Captain Harris arrived to fly the aircraft, conducted his preflight checks, and started the engines. Thereafter, he noticed a light which indicated a malfunction in the plane's anti-skid system. After unsuccessfully attempting to reset the indicator light, Captain Harris called for a maintenance specialist to fix it. However, maintenance personnel were unable to solve the problem, so the aircraft remained on the ground while Captain Harris flew his training mission in another plane.

Subsequently, maintenance personnel made further efforts to locate the cause of the problem; and after about 1½ hours they discovered that an electrical relay in the anti-skid system was disconnected. This relay was located in a place accessible from outside the aircraft; and it controlled electrical power to the anti-skid system. When the relay was disengaged, the capabilities of the F–15 were impaired—especially in landing. However, once the relay had been reconnected, the F–15 was again fully operational.

The Government offered evidence that on November 11, Ortiz was angry because he believed that his work hours were exces-

2. The members of the majority had not sat on the panel in *Johnson*.

sive. Before going out to work on the F-15 that morning, he had told a co-worker "that from now on for every hour of sleep he loses, the Air Force ... [will] lose out on flying time." Also, after aircraft 74–081 had been grounded that morning, he told another airman that he "might have pulled a few more wires than ... [he] thought." Later, the accused said "the Air Force had screwed him over a number of times and that for every time the Air Force had screwed him over, it was going to cost the Air Force one SORTE [sic], and he still owed them 3 or 4."

On another occasion after the grounding of 74–081, when another person asked him what had happened, he stated that "[t]hey'd yell sabotage." Thereafter, he produced a piece of paper with slash marks on it and commented "everytime management screws with me or they screw with me, I'm going to screw back with them." Referring to the marks on the paper, the accused said "he [had] grounded that many airplanes ... [a]nd he still owed them 5 or 6 more airplanes." He was also overheard to remark, after 74–081 was grounded, that he had "grounded another one."

Ortiz offered expert testimony that the disconnection of the relay had an innocent cause. Moreover, he testified that he had not disconnected the relay or interfered in any way with the aircraft. However, on cross-examination, he admitted making statements similar to those as to which the government witnesses had testified.

After argument, the military judge made these special findings:

> With respect to the findings, I found beyond a reasonable doubt that all elements of both charges were established by legal and competent evidence beyond a reasonable doubt. Specifically, that at Elmendorf Air Force Base, Alaska, on or about 11 November 1982, Airman First Class Ortiz, without property [sic] authority, disconnected a relay located in the bay of panel 48L of an F-15 aircraft, tail number 74–081. Further, that the F-15 aircraft was military property of the United States and also was national

defense material of the United States. Indeed the aircraft is an essential element of a primary weapon system, which could have been armed and employed in the defense of the United States at the time the relay was disconnected in considerably less than a period of one hour. I further find that the disconnection of the relay was willfully and intentionally done by Airman Ortiz. I further find that at the time the accused knew what the result of disconnecting the relay would be, namely, that the aircraft would be declared inoperable and that maintenance measures would be required. And further, I find that rendering subject aircraft inoperable constitutes damage and injury to the aircraft. I further find that the damage and injury to the aircraft was in some amount less than $50.00 and consisted of requiring trouble shooting of electrical systems until the disconnected relay was located. I hold that the consumption of fuel, although an expense to the United States Government, did not constitute damage or injury to the aircraft. I further find that by his act, the accused intended to interfere with the intended purpose or utilization of this aircraft and intended to detrimentally affect the operations of the United States Air Force in the defense of the United States.

I further find that the animus of the accused in doing this act was specifically directed towards the United States Air Force and not society in general and further was not simply an undirected spontaneous act. I find the accused's state of mind was announced by him on 11 November before launch procedures began to Airman Palmore. And after the launch, he made statements to Palmore, Scovell, and Oaks, which are tantamount to admissions that he caused the abort of the launch.

I have considered the accused's in court testimony and rejected it as being untruthful. He had access to panel 48L and opportunity to affect the disconnection. The testimony of Sergeant Wilson

and Hartman as to the very low probability of the relay being accidentally disconnected. Plus, the evidence that 10 to 12 pounds of force applied to an area of less than a square inch was necessary to depress the relay to disconnect it. Plus, the testimony of Airman McLoughlin and Sergeant Wilson that the relay in question was in good working order after it was found to be disconnected, convinces me beyond a reasonable doubt that it was not accidentally disconnected.

I have disregarded completely the evidence regarding throwing a breaker bar at the aircraft in question prior to the incident and the prior refusals, or evidence regarding prior refusals of the accused to launch aircraft in the past, in arriving at the above findings. As stated several times, the standard of proof utilized in reaching these findings was that of beyond a reasonable doubt.

## II

### A

18 U.S.C. § 2155 provides:

(a) Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any national-defense material, national-defense premises, or national-defense utilities, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

■■■ We have no doubt that the F–15 was "national-defense material," even though it was not armed for combat at that particular moment.[3] Nevertheless, there must be some injury, destruction, contamination, or infection of the "material." In this case, unlike *Johnson*, no replacement of parts was necessary. Instead, by reattaching wires and thereby reconnecting the relay, the aircraft was made operational within a short period of time. The only direct cost attributable to the accused's misconduct would be for the services of maintenance personnel—however that cost might be computed—and for the fuel that Captain Harris used in testing the aircraft engine before finally deciding to fly in another plane.[4]

Unlike *Johnson*, the Government did not contend that Ortiz foresaw or desired infliction of costly or permanent physical damage on the aircraft. Instead, its theory of the case, as articulated by the prosecutor, was that the accused had disconnected the relay with the expectation that the indicator light would reveal a malfunction; the aircraft then would be grounded for inspection; and the Government would lose its use for an hour or so. We must decide, then, whether to deprive the Government in this way of the use of an important weapon system for a short period of time constitutes willful "injury" for purposes of § 2155(a).

■■■ At first glance, the term "injure" in 18 U.S.C. § 2155(a) suggests physical damage or destruction which requires replacement. Supporting such an interpretation is the maxim that penal statutes should be narrowly construed. However, even a penal statute should be construed in a way that will accomplish its obvious purpose. In this instance, the relevant legislative purpose for enacting § 2155(a) was to assure that the national-defense establishment would be ready to protect the country against aggression. The experience at Pearl Harbor had demonstrated to Congress that an enemy might attack in great strength and without notice and that American armed forces must always be ready to fight. Section 2155(a) should be interpreted in a way that will promote this goal.

---

**3.** In *United States v. Johnson*, 24 M.J. 101 (C.M. A.1987), the injury to the aircraft was alleged as sabotage of a "national-defense utility," which we decided was permissible. However, as we noted there, combat aircraft fit more neatly into the category of "national-defense material." *Id.* at 108 n. 4.

**4.** The judge decided—quite properly in light of the allegations—"that the consumption of fuel, although an expense to the United States Government, did not constitute damage or injury to the aircraft."

From the standpoint of readiness, if a weapon system does not work when an attack occurs, the reason for its malfunction makes little difference. A weapon system that has been severely damaged—like the F–4 involved in *Johnson*—is useless in defending against a present attack. Likewise, the F–15 that Ortiz dismantled would have been useless in defending against enemy airplanes enroute to their target, even though in a short time it could be reassembled and made operational. Similarly, if a weapon system is controlled by a computer and the computer program has been altered so that intended targets cannot be hit, it is immaterial that the computer could be quickly reprogrammed.

■ Our nation's safety is measured now in seconds—or even milliseconds. We are convinced that Congress was well aware that weapons which do not work provide no protection. Even worse, they create a false sense of security. Accordingly, we conclude that, when the integrity of a weapon system has been directly affected so that it cannot be immediately utilize[d] for its intended military purpose, it has been "injure[d]" within the meaning of § 2155(a).

■ The United States makes a substantial investment in such aircraft as the F–15. A servicemember who acts to disable the aircraft from operating in the intended manner has deprived the Government of the benefit of this investment. By his action which impairs the functioning of the weapon and causes loss of its use, he causes "injury" for purposes of § 2155(a).

### B

■ In *United States v. Johnson, supra* at 105, 107, we stated:

§ 2155(a) would be satisfied if someone acted when he knew that injury to the national defense would be the almost inevitable result, even though the reason for his action had nothing to do with national defense.

\*      \*      \*      \*      \*      \*

If, in fact, he did know that it was practically certain that damage to the aircraft would occur because of his acts and that, in turn, this would injure national defense, he had the state of mind requisite for conviction under § 2155(a)—even though he may not have desired or wished to injure national defense.

We also recognized:

Usually the intent to cause certain results is established by evidence that those results followed naturally and probably from the action that was taken. The permissible inference, as to which a military judge often has occasion to instruct court-martial members, is that the accused decided to act despite the likely consequences of doing so. However, only an *inference* is involved; and the necessary intent is lacking unless the factfinder determines not only that the prohibited results were highly foreseeable, but also that the accused, in fact, knew they were almost certain and nonetheless went ahead.

*Id.* at 105–106.

The military judge had before him evidence which supported his finding that Ortiz had disconnected the electrical relay in the aircraft's anti-skid system in order to ground it and to prevent performance of its assigned mission on the morning of November 11. His purpose was to retaliate for extra work he was performing. However, it seems clear that Ortiz did not intend or foresee the infliction of extensive physical damage or the protracted loss of use of the aircraft—like that which had occurred in *Johnson*. Moreover, the record does not indicate that Ortiz had received the extensive briefings that Johnson had been given.

Consequently, in some respects this case is more akin to *United States v. Stewart*, 19 U.S.C.M.A. 417, 42 C.M.R. 19 (1970), than to *Johnson*. Stewart, a flightline crew member, had thrown foreign objects into the air intake duct of a jet engine; but he had done so under circumstances which made it clear that others would observe his action. This Court concluded "that had the

accused been intent on interfering with the national defense of the United States he would have acted in a more surreptitious manner and not so openly." *Id.* at 420, 42 C.M.R. at 22. Thus, he was held not to have possessed the intent required for a conviction of attempted sabotage.

Apparently the rationale of *Stewart* was that the accused there did not expect the jet engine to be operated before someone had cleaned the objects in the duct. Thus, he planned to cause only inconvenience and brief loss of use; and this Court refused to equate that state of mind to an intent to injure the national defense.

Similarly, according to the Government's own theory of liability, Ortiz reasonably anticipated on the morning of November 11 that the F–15 on which he had worked would be grounded for only an hour or so, until maintenance personnel discovered why the indicator light was on. The aircraft's mission on that day was primarily for training and for support of the Veteran's Day celebration in Anchorage. The F–15 was not armed; and another aircraft was readily available, wherein the pilot, Captain Harris, could, and did, perform the planned training mission. There is no evidence that Ortiz had received any briefing or instructions that would have led him to believe that the unavailability of the aircraft for this short period would endanger the national defense in any way. Under these circumstances, the legal sufficiency of the evidence is questionable. However, rather than decide that issue at this time, we consider it appropriate for the Court of Military Review to be allowed the opportunity to express its opinion as to the legal and factual sufficiency of the evidence to prove the necessary intent, in light of this Court's opinions in *Johnson* and *Stewart.*

### III

The conviction under Article 108 required proof of willful "damage." Just as we inquired whether the disconnection of the relay system constituted "injury" under 18 U.S.C. § 2155(a), we must ask whether it was "damage" within the meaning of Article 108 of the Uniform Code.

The discussion of that Article in the 1951 and 1969 Manuals for Courts-Martial stated:

> In the case of loss, destruction, sale, or wrongful disposition, the value of the property controls the limit of punishment which may be adjudged therefor, but in the case of damage, the amount of damage instead of the value of the property damaged is controlling. As a general rule, the amount of damage is the estimated or actual cost of repair by the governmental agency normally employed in such work, or the cost of replacement, as shown by government price lists or otherwise, whichever is the lesser.

*See* para. 187*c*, Manual for Courts-Martial, United States, 1951; para. 187*c*, Manual for Courts-Martial, United States, 1969 (Revised edition).[5] Clearly, this language contemplates tangible "damage" which occasions cost for repair or replacement. Does the term "damage" also embrace the dismantling of equipment which occurred in this case?

Although "damage" is not defined in the Code, it is treated in the Manual discussion of Article 109, UCMJ, 10 U.S.C. § 909, which prohibits destruction or damage of property other than military property. According to the Manual, "Damage consists of any physical injury to the property." Para. 188*b*, 1951 Manual, *supra;* para. 188*b*, 1969 Manual, *supra;* Part IV, para. 33*c*(2), Manual for Courts-Martial, United States, 1984. The Manual discussion also states that "[t]o be destroyed, the property need not be completely demolished or annihilated, but need be only sufficiently injured to be useless for the purpose for which it was intended." *Ibid.; see* para. 33*c*(2), 1984, Manual *supra.* This emphasis on the property's use for its intended purpose is helpful in interpreting the scope of the term "damage"—just as

---

5. The explanation of Article 108 in the 1984 Manual, which took effect after appellant's trial, is almost identical. Part IV, para. 32*c*(3), Manual for Courts-Martial, United States, 1984.

interference with intended use is the key to the construction of "willful injury" in 18 U.S.C. § 2155(a). In line with our treatment of § 2155(a), we construe "damage" in Article 108 to encompass "physical injury to the property"; and, in turn, "physical injury" includes rendering military property useless for its intended purpose even temporarily by means of disassembly, reprogramming, or removal of a component. Accordingly, the evidence was sufficient to sustain the conviction for willful damage of the F–15.

## IV

■ The military judge specifically found that the value of the damage to the aircraft was "less than $50.00." The Table of Maximum Punishments, paragraph 127c, 1969 Manual, *supra*—which was then in effect—listed the maximum punishment for willful damage to military property of $50.00 or less as a bad-conduct discharge and confinement for 6 months. However, the court below, after reassessment, affirmed a sentence which included confine-

ment for 1 year. Ortiz complains that the reassessment is erroneous as a matter of law because his sentence to confinement exceeds the maximum allowable punishment for the offense as to which the conviction was affirmed.

We agree. A sentence which exceeds the maximum punishment authorized by the Table of Maximum Punishments cannot be affirmed —however "appropriate" it may seem to an appellate tribunal. Accordingly, unless the conviction for sabotage ultimately is upheld, we conclude that the sentence to confinement must be reduced.

## V

The decision of the United States Air Force Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Air Force for remand to that court for further review.[6]

Judge COX concurs.

Judge SULLIVAN did not participate.

Advocate General.

---

6. We believe that our opinion adequately disposes of the questions certified to us by the Judge