**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Denny TURPIN, Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jonathan SMITH, Defendant–Appellant.**

**Nos. 94–5522, 94–5523.**

United States Court of Appeals,
Fourth Circuit.

Argued June 9, 1995.

Decided Sept. 27, 1995.

does not apply here." *Id.* at 315.

**ARGUED:** William Randall Light, Law Office of Killis T. Howard, Lynchburg, VA, for appellant Turpin; William George Wentz, Bedford, VA, for appellant Smith. Donald Ray Wolthuis, Assistant United States Attorney, Roanoke, VA, for appellee. **ON BRIEF:** Robert P. Crouch, Jr., United States Attorney, Karen B. Peters, Assistant United States Attorney, Roanoke, VA, for appellee.

Before WIDENER, MICHAEL, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge MICHAEL wrote the majority opinion, in which Judge WIDENER joined. Judge MOTZ wrote a separate dissenting opinion.

## OPINION

MICHAEL, Circuit Judge:

On February 18, 1993, Denny Turpin and Jonathan Smith cut down and stole copper communication wire used by a railroad on which military materials were shipped. They were convicted for violation of and conspiracy to violate 18 U.S.C. § 1362, which prohibits willful destruction of a communication facility used or intended to be used for military or civil defense functions of the United States. Their main argument on appeal is that the railroad's communication line does not fall within the scope of § 1362. They also challenge the admission of certain evidence. We affirm.

## I.

CSX is a major railroad company whose tracks run through Campbell County, Virginia. The railroad's internal communication line, made of uninsulated copper wire, is strung on poles along the track. On the evening of February 18, 1993, CSX employee Wayne Carter was patrolling a section of the track near Lynchburg in Campbell County. He came across Turpin and Smith, who were in a four-wheeled all terrain vehicle ("four-wheeler") beside the railroad, and warned them to move their vehicle away from the track. Continuing down the track, Carter came across a third man in the process of cutting down the railroad's copper communication wire with a tree pruner. The man fled when he saw Carter, leaving the pruner behind. A short time later, Turpin and Smith drove up in the four-wheeler. Carter (who evidently assumed the three men were together) told Turpin and Smith the direction in which the third man had fled, and they left in that direction.

When police arrived, they found Smith's pickup truck near the place Carter had first seen Turpin and Smith. In the bed of the truck was an empty merchandising package for a new tree pruner, and piled near the truck were five reels of copper wire weighing about 1,200 pounds. All of the naked copper wire along the track in that area had been cut down. Turpin and Smith denied any knowledge of the wire theft or the third man.

The following evening police seized the four-wheeler at the home of its owner, Tracy Owens (a friend of Turpin). Material lifted from the vehicle's rear rack at that time was later identified as copper residue. Upon further investigation police discovered that a number of copper wire thefts had occurred in January and February 1993 in areas of Virginia and West Virginia near Turpin's home.

Tire tracks found at the sites of those thefts matched those of the four-wheeler used by Turpin and Smith. Police also discovered that between January and February, Turpin had sold to a local salvage company thousands of pounds of naked copper wire of the type belonging to CSX.

The copper line installed along CSX's track was used for communication among train crews, maintenance forces, and train stations and was necessary for the proper functioning of the railroad. If the line was damaged, trains could be slowed or stopped. Furthermore, the communications line was strung just above the railroad's signal wire. When the communications line was cut, it occasionally dropped onto or became entangled with the signal wire, short circuiting the signal system. In fact, a few weeks following the theft, a cut communication line caused exactly this type of short circuit. CSX employees testified that a short circuit in the signal system could result in a collision. Finally, the track near Lynchburg was used to transport classified military materials to the Naval Nuclear Fuel Division of Babcock & Wilcox, a defense contractor located in Campbell County. These shipments related to activities of the United States Navy.

Turpin and Smith were convicted for violation of and conspiracy to violate § 1362, and they appeal.

## II.

### A.

Turpin and Smith first claim that their conduct did not fall within the scope of the statute under which they were convicted. 18 U.S.C. § 1362 provides criminal penalties for

> Whoever willfully or maliciously injures or destroys any ... cable, line, ... or other means of communication, operated or controlled by the United States, or used or intended to be used for military or civil defense functions of the United States.

Turpin and Smith argue that the railroad's internal communication line was not "used or intended to be used for military ... functions" within the meaning of § 1362. Their argument encompasses two separate issues. First, the defendants argue that the ship-

ment of military material to a defense contractor is not a "military function." Second, they contend that even if the railroad is used for a military function, the communication line, which is merely an appurtenance to the railroad, is not itself used for a military function. We analyze § 1362 with these issues in mind.

 The scope of § 1362 has never been addressed by any court, so we start from scratch. We interpret a statute according to its plain language and in light of its object and policy. *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990). Our inquiry is complete if "the terms of [the] statute are unambiguous on their face, or in light of ordinary rules of statutory construction." *United States v. Morison,* 844 F.2d 1057, 1064 (4th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 247 (1988).

██ We begin with the language of § 1362 itself, which, although brief, is expansive. The statute applies not only to lines "operated or controlled by the United States" but also to privately held lines "used or intended to be used for military ... functions." It does not distinguish between lines used directly by the military and lines used by civilians, nor does it distinguish between commercial and non-commercial facilities. Construed literally, therefore, the statute encompasses a private internal line used for a military function. While the statute does not itself define "military function," we may deduce the scope of this term by comparison with analogous statutes and by analysis of § 1362's legislative history.

██ While no court has interpreted the scope of § 1362, judicial interpretation of the closely analogous Sabotage Acts, 18 U.S.C. §§ 2151–55, suggests that the term "military function" should be given broad scope. The Sabotage Acts, which have existed since 1918, were precursors to § 1362 and have similar purposes. 18 U.S.C. § 2153 prohibits the destruction of "war material, war premises, or war utilities" in wartime. 18 U.S.C. § 2155 prohibits the destruction of "national-defense material, national-defense premises, or national-defense utilities" with the intent

to injure or obstruct national defense. While the Sabotage Acts are broader than § 1362 in the sense that they apply to facilities other than communication lines, they share with § 1362 the common purpose of protecting facilities related to national defense. As we discuss more fully below, Congress explicitly amended § 1362 in 1961 to extend the protection for communication facilities that already existed under the Sabotage Acts during wartime or in cases of specific intent to injure national defense. Therefore, cases construing the scope of protection for defense-related facilities under the Sabotage Acts bear on the scope of § 1362.

The few cases interpreting §§ 2153 and 2155 establish that their purpose and scope are broad. Courts interpreting "national defense" as used in § 2155 have held that the term "is a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." *United States v. Kabat*, 797 F.2d 580, 586 (8th Cir., 1986), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987); *United States v. Melville*, 309 F.Supp. 774, 780 (S.D.N.Y.1970) (*quoting Gorin v. United States*, 312 U.S. 19, 28, 61 S.Ct. 429, 434, 85 L.Ed. 488 (1941)). As the Court of Military Appeals has noted, "the relevant legislative purpose for enacting 2155(a) was to assure that the national defense establishment would be ready to protect the country against aggression.... 2155(a) should be interpreted in a way that will promote this goal." *United States v. Ortiz*, 24 M.J. 164, 168 (C.M.A.1987). While § 1362 uses the term "military function" rather than "national defense," we believe Congress intended its scope to be similarly expansive.

If Turpin and Smith had cut down the railroad's communication line during wartime (or with intent to injure national defense), their conduct would have been prohibited by the Sabotage Acts. Under those Acts, "[w]ar utilities" include "telephone and telegraph ... wires ... used to supply ... communication to any war premises ...," 18 U.S.C. § 2151, and "[w]ar premises" include "all ... places wherein ... war material is being ... transported...." *Id.* "National-defense util-ities" and "national-defense premises" are similarly defined. *Id.* A railroad line is a "place wherein" war material or national defense material may be transported. A case decided following the First World War held, on facts nearly identical to those of the present case, that copper line wire in a telegraph system owned by the Louisville & Nashville Railroad and used in connection with the transportation of war material was a "war utility" within the meaning of § 2153. *Weisman v. United States*, 271 F. 944, 945 (7th Cir.1921). Because § 1362's purpose in these circumstances is identical to that of the Sabotage Acts, it should be given similar scope. *See United States v. Fermin Castillo*, 829 F.2d 1194, 1198 (1st Cir.1987) (statute should be construed similarly to older statute on which legislative history indicated it was based); *Hallenbeck v. Penn Mutual Life Ins. Co.*, 323 F.2d 566, 571 (4th Cir.1963) (statutes with common purpose should be similarly construed).

The legislative history of § 1362 buttresses our conclusion that its scope was intended to be broad. Prior to 1961, § 1362 prohibited only the destruction of communications facilities "operated or controlled by the United States." The 1961 amendment extended the prohibition to facilities used or intended to be used for military or civil defense functions. Pub.L. No. 87–306, 75 Stat. 669 (1961). The purpose of the amendment was to provide protection for privately-owned communication lines necessary to national defense. H.R. Rep. 965, 87th Cong., 1st Sess. (1961), *reprinted in* 1961 U.S.C.C.A.N. 2997, 2998; S.Rep. No. 458, 87th Cong., 1st Sess. 2, 3 (1961). The Report of the House Judiciary Committee accompanying the 1961 amendment focuses on the importance of communications to the nation's military readiness in a wide variety of areas, including civilian warning, command, and logistical support. 1961 U.S.C.C.A.N. at 2999–3000. It explicitly notes that the amendment was intended to extend prohibitions that already existed under the Sabotage Acts during wartime or when a perpetrator displayed specific intent to injure national defense. *Id.* at 2999. The Report also makes clear that the provision protects even lines that are not themselves used directly by the military, as long as they

are used for military or civil defense functions. For example, the statute protects communications facilities used by civilian employees of radio stations that form the Conelrad civilian defense network. *Id.*

While many of the examples that the Committee cites involve commercial lines, nothing in the legislative history or the statutory language indicates that § 1362 should not apply to private (non-commercial) lines used for military functions. If Congress had meant to restrict the protection of § 1362 to commercial lines, it could have made that intent quite clear by including this restriction in the language of the statute. *See Doski v. M. Goldseker Co.*, 539 F.2d 1326, 1332 (4th Cir.1976) (Courts should not "assume that it was only by inadvertence that [the legislature] failed to state something other than what it plainly stated.").

 With this background in mind we return to Turpin's and Smith's arguments, as outlined above, that their conduct did not violate § 1362. First, we reject any contention that the shipment of military material to a defense contractor for use on a project directly affecting the Navy is not a "military function." Given § 1362's broad language and purpose, we believe the shipment of defense-related materials is within the scope of activity Congress intended to protect. Second, we believe that the communication line, as well as the railroad itself, served this military function. The purpose of the statute is to protect military functions of the federal

government by protecting the communication lines necessary to their fulfillment. Testimony at trial established that CSX's communication wire was necessary to the proper functioning of the railroad, and that its destruction could slow or stop trains or cause a collision, jeopardizing military shipments. We believe that § 1362's purpose is best served by a holding that communication lines vital to the transportation of defense-related materials are "used for a military function." *See United States v. Pomponio*, 558 F.2d 1172, 1175 (4th Cir.1977) (rejecting interpretation that would "defeat the purpose of the Act"), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1233, 55 L.Ed.2d 761 (1978).* Accordingly, we hold that the evidence at trial was sufficient to support the convictions of Turpin and Smith for violation of and conspiracy to violate § 1362.

### B.

██ Turpin and Smith next contend that the district court erred in admitting evidence of thefts of copper wire that they allegedly committed prior to the February 18 theft. The court admitted, as direct evidence on the conspiracy charge, evidence of three thefts that occurred, respectively, in Botetourt County, Virginia, in February 1993; in Rockbridge County, Virginia, in February 1993; and in West Virginia in January 1993. Considerable evidence connected Turpin and Smith to these thefts: all three locations were near Turpin's residence, Turpin sold substantial amounts of copper wire to a sal-

---

* We are not dissuaded by the dissent's disapproval of our reliance on the Sabotage Acts and § 1362's legislative history. First, we discussed the Sabotage Acts to show that courts have given a broad interpretation to the term "national defense." We believe courts have done this because the term is "well understood" to have a broad connotation, *see Gorin v. United States*, 312 U.S. at 28, 61 S.Ct. at 434, not because Congress inserted certain intent or belief requirements into the Sabotage Acts. Thus, we are comfortable in concluding that like "national defense," the term "military function" (used in § 1362) has a broad scope. Second, we disagree with the dissent's suggestion that "[n]othing" in § 1362's legislative history supports the application of § 1362 "to a private (non-commercial) communication system that is used exclusively by its owner," here CSX. *Post* at 1214–15. The purpose of § 1362, as the legislative history

makes plain, was to extend statutory protection to privately-owned communication systems so that they would be available for military functions. Thus, the ultimate question is whether the privately-owned line is used for a "military function," not whether it is a commercial as opposed to an intracompany line.

In any event, as we read the thrust of the dissent, it is that there is an insufficient connection between the CSX communication line and a "military function." But it cannot be reasonably questioned that the railroad was used for a military function. It carried classified materials to a nuclear defense contractor that did work for the Navy. The stolen communication line was an essential component of the railroad, necessary to its efficient and safe operation. We do not believe we are stretching it to say that the communication line, as an integral part of the railroad, was used for a military function.

vage company several times in January and February 1993, and tire tracks at all three sites matched the tread of the four-wheeler Turpin and Smith had used on February 18. The indictment charged Turpin and Smith with a conspiracy to violate § 1362 lasting "from on or about January, 1993 to on or about February 18, 1993." All three of the thefts were relevant because they occurred within the scope of this conspiracy, and therefore the court did not err by admitting evidence about them.

### C.

Finally, Turpin and Smith claim the district court erred in admitting the copper residue lifted from the rack of the four-wheeler. They contend that because the residue was not taken until the day after the crime occurred, it could have been deposited on the rack at some point between the commission of the crime and the seizure of the four-wheeler the following evening. Therefore, the defendants maintain, the government failed to establish the "chain of custody" required to authenticate the copper residue.

■■■ The time that the residue was lifted has nothing to do with its authenticity. The authentication requirement of the Federal Rules of Evidence requires only that a party introducing evidence demonstrate that the evidence is in fact what its proponent claims. Fed.R.Evid. 901(a). The "chain of custody" rule is simply a variation of this principle, *United States v. Howard–Arias*, 679 F.2d 363, 366 (4th Cir.), *cert. denied*, 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982), and requires that a prosecutor seeking to introduce seized evidence must establish a chain of custody from the time the items were taken to show that they are in "substantially the same condition as when they were seized." *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir.) (internal quotations omitted), *cert. denied*, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991).

■■■ Here, Turpin and Smith do not allege that the copper residue is not in the same condition as when it was seized. In other words, they do not dispute that the

item is exactly what the government says it is: copper residue lifted from the four-wheeler the night following the crime. *See Howard–Arias*, 679 F.2d at 366. The fact that the residue was not seized until the day after the wire was stolen bears only on the residue's weight as evidence of the crime; it has no relevance to the residue's authenticity. The district court did not abuse its discretion in admitting the copper residue.

### III.

The convictions of Turpin and Smith are affirmed.

*AFFIRMED.*

MOTZ, Circuit Judge, dissenting:

I respectfully dissent.

The statute that Turpin and Smith were convicted of violating provides criminal penalties for

> Whoever willfully or maliciously injures or destroys any … cable, line, … or other means of communication, operated or controlled by the United States, or used or intended to be used for military or civil defense functions of the United States. . . .

18 U.S.C. § 1362. In assessing whether Turpin and Smith violated this statute, it is important to keep in mind precisely what they did and what they did not do. They did not steal copper wire or any other "means of communication operated or controlled by the United States." Nor did they steal copper wire or any other "means of communication" that was *itself* "used or intended to be used for military or civil defense functions of the United States." The copper wire that Turpin and Smith were charged with stealing belonged to and was "operated or controlled by" CSX Railroad, a private company. Moreover, as the government concedes, this privately owned and controlled copper wire was "used as [part of] an *internal telephone system for the railroad*, for emergencies and other needed communication related to the running of the trains." Brief of Appellee at 5 (emphasis added). Because CSX shipped military materials for a defense contractor, the majority concludes that theft of the copper wire used in the railroad's internal tele-

phone system violated § 1362. I disagree and so dissent.

The plain language of the statute does not address the question before us. True, the statute applies not only to "means of communication operated or controlled by the United States" but also to those "used or intended to be used for military or civil defense functions of the United States." The statute, however, does not state, or imply, that "means of communication" used by a private company for its own internal communications are used for "military or civil defense functions of the United States" just because the private company transports goods for another private company which in turn uses those goods for "military or civil defense functions of the United States." It seems to me that if the wire at issue here is held to be used "for military or civil defense functions of the United States," then that term is no limitation at all. Virtually *every* existing communication system is used in some way that ultimately contributes to "military or civil defense functions of the United States." I cannot believe that Congress intended the statute to have such a broad sweep. Moreover, the fact that the scope of § 1362 "has never been addressed by any court" suggests that, at least to date, law enforcement officers have similarly concluded that such a construction of the statute was not intended by Congress.

In holding to the contrary, the majority relies on cases interpreting the Sabotage Acts, 18 U.S.C. § 2153 and § 2155. Although those statutes do, as the majority notes, "share with § 1362 the common purpose of protecting facilities related to national defense," their language is, as the majority concedes, "broader" than that employed in § 1362. Indeed, it seems to me that the language of the Sabotage Acts is so different from that of § 1362 as to make case law interpreting the Sabotage Acts of little assistance here. Section 2155 requires proof of specific "intent to injure, interfere with, or obstruct the national defense of the United States." 18 U.S.C. § 2155. Without such proof, there can be no violation of § 2155. *See United States v. Johnson*, 15 M.J. 676 (A.F.C.M.R.1983) (finding evidence insufficient to prove violation of § 2155 because defendant was only shown to be angry and upset and not to have a desire to harm national defense). Although § 2153 does not require proof of specific intent, it does require proof that the defendant had "reason to believe that his act may injure, interfere with, or obstruct the United States" and it only applies "when the United States is at war, or in times of national emergency." 18 U.S.C. § 2153.

In contrast, the statute at issue here, § 1362, contains no requirement that specific intent or "belief" be proved; nor is the reach of § 1362 confined to times of war or national emergency. Accordingly, there does not seem to me any reason to conclude that the broad reading given § 2153 and § 2155 should similarly be given § 1362. Rather, in reading the three statutes together one is left with the conclusion that when Congress, in enacting § 2153 and § 2155, painted with a broad brush—in defining "war utilities" or "national-defense utilities"—it was careful to limit liability in another way—by requiring proof of "belief" or specific intent and by confining liability to times of war or national emergency. Because none of the limitations contained in the Sabotage Acts are incorporated in § 1362, I cannot conclude that the broad interpretation given the Sabotage Acts is equally applicable to § 1362.

Nor do I believe that the legislative history of § 1362 supports a contrary conclusion. The Report of the House Judiciary Committee accompanying the 1961 amendment to § 1362 makes it clear that the purpose of the amendment extending the statutory prohibition against destruction of communication systems "operated or controlled by the United States" to those "used for military or civil defense functions" was to preserve the national security. H.R.Rep. No. 965, 87th Cong., 1st Sess. (1961), *reprinted in* 1961 U.S.C.C.A.N. 2997, 2998; S.Rep. No. 458, 87th Cong., 1st Sess. (1961). Thus the Report begins with the statement:

The extent to which the internal security of the United States is dependent upon secure, positive, and instantaneous communications can best be understood by a brief reflection on the speed with which this

Nation must alert her people and her defenses if supersonic missiles with atomic warheads are ever launched against her shores.... Our defense and retaliatory forces are only as good as the means we have for alerting those forces.

1961 U.S.C.C.A.N. at 2998. The Report continues in this vein, clearly emphasizing the necessity of preserving the country's communications systems to protect the national security. *Id.* at 2998–3001. The Report repeatedly focuses on the importance of "commercial communications systems," systems "supplied by commercial companies," "commercial communications facilities," "commercial carriers," "commercial facilities," "regular commercial systems," and "commercial companies." *Id.* at 2998–3000.

Nothing in the Report suggests that § 1362, as amended, is to be applied to a private (non-commercial) communication system that is used exclusively by its owner, for the owner's private purposes, just because those private purposes tangentially relate to "military or civil defense functions of the United States." Rather, the Report concludes with language that strongly suggests that the 1961 amendment is to be limited to commercial systems:

> This bill proposes to amend existing law to protect those portions of *the facilities of commercial carriers* which are used or intended to be used for military or civil defense functions of the United States.

*Id.* at 3000 (emphasis added). The CSX copper wire at issue here was part of a private company's "internal telephone system" and so was obviously not a portion of the facility of a commercial communication carrier. The legislative history of the 1961 amendment to § 1362 suggests that the amendment was never intended to make the theft of such wire a federal crime.

Where, as here, the "text, structure, and history" of a criminal statute fail to establish that "the Government's position is unambiguously correct," the Supreme Court has directed that the "rule of lenity" be applied and the ambiguity be resolved in the defendant's favor. *United States v. Granderson,* —— U.S. ——, ——, 114 S.Ct. 1259, 1267, 127 L.Ed.2d 611 (1994). This " 'time-honored interpretative guideline' serves to ensure both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability." *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1002, 108 L.Ed.2d 132 (1990) (quoting *Liparota v. United States,* 471 U.S. 419, 427, 105 S.Ct. 2084, 2089, 85 L.Ed.2d 434 (1985)). Thus, to the extent § 1362 is ambiguous, I would resolve that ambiguity in favor of Turpin and Smith "unless and until Congress plainly states that we have misconstrued its intent." *Id.* at 168, 110 S.Ct. at 1007.

Turpin and Smith may well have been guilty of larceny, but in my view they did not violate § 1362. I would reverse.