IN THE CASE OF


UNITED STATES, Appellee

v.

Bertram T. DANIELS, Staff Sergeant
U. S. Air Force, Appellant

No. 01-0607

Crim. App. No. 33761

United States Court of Appeals for the Armed Forces

Argued December 11, 2001

Decided March 15, 2002

SULLIVAN, S.J., delivered the opinion of the Court, in which
CRAWFORD, C.J., and GIERKE, EFFRON, and BAKER, JJ., joined.

### Counsel

For Appellant:   Lieutenant Colonel Brandon A. Burnett (argued);
Lieutenant Colonel Beverly B. Knott, Lieutenant Colonel
Timothy W. Murphy, and Major Maria A. Fried (on brief); Major
Jeffrey A. Vires.



For Appellee:   Major John D. Douglas (argued); Colonel Anthony
P. Dattilo and Major Lance B. Sigmon (on brief).



Military Judge: W. Thomas Cumbie


THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

Senior Judge SULLIVAN delivered the opinion of the Court.

On April 26 through 29, 1999, appellant was tried by a general court-martial with officer and enlisted members at McChord AFB (AFB), Washington.  Contrary to his pleas, he was found guilty of one specification of willful damage to military property, a C-141B aircraft, and one specification of making a false official statement, in violation of Articles 108 and 107, Uniform Code of Military Justice, 10 USC §§ 908 and 907.  The members sentenced him to a bad-conduct discharge, reduction to pay grade E-1, and forfeiture of all pay and allowances.  On July 29, 1999, the convening authority approved the sentence as adjudged.

The Air Force Court of Criminal Appeals affirmed the findings of guilty on March 28, 2001.  However, it reduced the sentence by affirming only so much of the sentence as provided for a bad-conduct discharge, reduction to E-1, and forfeiture of $632.00 pay per month until the bad-conduct discharge is executed.  United States v. Daniels, No. 33761 (A.F. Ct. Crim. App. March 28, 2001).

On September 12, 2001, this Court granted review of the following issue:

> WHETHER THE EVIDENCE IS LEGALLY INSUFFICIENT
> TO CONVICT APPELLANT OF WILLFULLY DAMAGING
> MILITARY PROPERTY.

We hold that, based on the evidence in this case, a rational trier of fact could have found beyond a reasonable doubt all of the elements of the offense of willfully damaging military property, i.e., the nose landing gear inspection window of a C-141B aircraft. Therefore, we affirm the decision below. See United States v. Davis, 44 MJ 13, 18-19 (1996); see generally Jackson v. Virginia, 433 U.S. 307, 319 (1979).

Evidence was admitted in this case that on February 11, 1998, appellant was a Reservist serving on active duty as a loadmaster for a flight between Hickam AFB, Hawaii, and Yokota AFB, Japan.[1] During that flight, the aircraft failed to pressurize. After an in-flight inspection of the aircraft, appellant advised the crew that the number two hatch, an emergency crew escape hatch, was unsecured. The aircraft returned to Hickam, and the mission was delayed one day. The next day, the aircraft flew to Yokota.

The second leg of the mission was a return flight from Yokota to Hickam on February 14, 1998. Again, shortly after takeoff, the aircraft failed to pressurize, and the pilot, Major Bomar,

---

[1] The flight actually initiated at McChord AFB, Washington.

made the decision to return to Yokota. Master Sergeant Jones, the flight engineer, testified that after the aircraft landed, appellant showed him some screws and asked him if he (Jones) knew where the screws came from. Jones testified that he thought he recognized the screws as being from the main landing gear inspection window. However, they proved to be too long. He then realized that because of their length, the screws came from the nose landing gear inspection window.

The nose landing gear inspection window is located behind the crew's latrine. Master Sergeant Jones and appellant checked the nose landing gear inspection window and found that only one screw (of six) was in place. Jones testified that appellant told him the trashcan in the latrine had been turned over and the screws were on the floor. A further search of the trashcan turned up an additional screw, to account for all six required to secure the window. Major Bomar testified that he determined the cause of the depressurization problem was the unsecured inspection window. (R. 107-08, 117)

Staff Sergeant Ray Wallace testified that on February 11 through 14, 1998, he was a loadmaster on the mission from McChord AFB, Washington, through Hickam AFB, Hawaii, to Yokota AFB, Japan, and back. Appellant was also a loadmaster on that mission.

4

Sergeant Wallace testified that on the return leg of the mission (from Yokota to Hickam), he conducted the preflight inspection of the aircraft, which included checking the crew latrine for cleanliness and serviceability. He did not see any screws in the sink or on the floor of the latrine, and there was no trash in the trashcan. The nose landing gear inspection window appeared to be in place. He and Staff Sergeant Chris Wallis, a second member of the crew, then left the aircraft to get breakfast. Appellant remained with the aircraft.

Sergeant Wallace testified that, after having some breakfast in the air station terminal, he returned to the aircraft to conduct a stowaway check. However, he did not personally conduct a stowaway check in the crew's latrine. At the time he conducted the inspection, appellant was working in the area between the crew's latrine and the comfort pallet.2 Because of the lack of space between the latrine and the comfort pallet, he pointed to the latrine. Appellant gave him a "thumbs up" and reached for the door handle. Sergeant Wallace testified that these gestures made him believe that appellant would check the latrine.

Sergeant Wallis testified that on the morning of February 14, 1998, he was assigned as the "scanner" for the mission as it

---

2 The "comfort pallet" is a modular compartment that has latrines, a refrigerator, and other items for the comfort of passengers in what is essentially an aircraft configured to haul cargo.

left Yokota AFB. (R. 219)  As the scanner, he walked around the aircraft "looking for obvious things" and then began his preflight inspection of the aircraft.  As part of this inspection, he checked the nose landing gear inspection window from the outside by physically tapping it.  The window was in place and secure. (R. 220-21)

After these checks, he went back to the terminal to get some food.  When he returned to the aircraft, he made a second exterior check of the aircraft, put on his communications headset, and started the engines.  After the preflight checks were complete, he boarded the aircraft and went to the flight deck.

Sergeant Wallis also testified that after the aircraft took off, he made an additional interior check to insure that the aircraft was operating properly.  About midway through this check, appellant informed him that the aircraft, was not pressurizing. (R. 223)  Wallis testified that he immediately checked the rear doors of the aircraft, as well as other areas. However, he could not find any opening that might have precluded proper pressurization.  Because the crew was unable to find any breaks in the integrity of the aircraft, the aircraft commander returned to Yokota AFB.

As the aircraft crew was waiting on the ground at Yokota, a maintenance crew inspected the aircraft but could not find the

6

problem. Major Bomar called off the flight. Ninety minutes after the flight had landed again, appellant approached Wallis and said, "Look what I found," displaying several screws. (R. 224) Appellant did not tell Wallis where he found the screws. However, Wallis recognized the screws and asked appellant if they came from the inspection window. Appellant stated: "Nose landing gear inspection window." (R. 225)

Appellant initially told Sergeant Wallis that he had gone into the latrine and found the trashcan tipped over, and that three screws were on the floor of the latrine and others were in the trashcan itself. Later (about one-and-a-half hours), he told Wallis that he had found the screws when he went to use the latrine and saw them on the floor. However, when Wallis asked him about the trashcan, appellant appeared not to know what he was talking about. (R. 225)

Special Agent (SA) Mark Walker of the Office of Special Investigations (OSI) testified that he was initially directed to conduct an investigation into the possible tampering with an aircraft. (R. 253) He inspected the aircraft and found that screws had been removed from the nose landing gear inspection window. (R. 255) He interviewed a number of people on the scene, including appellant. He testified appellant informed him that after the aircraft returned to Yokota AFB, the crew had inspected the aircraft. Appellant further told SA Walker that he had entered the crew latrine to find that the trashcan had been

7

turned over, and that three screws were laying on the floor. After taking a number of photographs of the area, SA Walker decided to continue the investigation the following day.

The following day, appellant came to the OSI offices. He was warned of his rights under Article 31(b), UCMJ, 10 USC § 831(b), and acknowledged those rights. He agreed to speak with SA Walker and gave him a statement. During this statement, appellant reiterated his earlier assertions that he had found the screws on the floor in the crew's latrine.

SA Tracy Tomlins, also of the OSI, testified that during his subsequent interview with appellant, he related the same story as he had given SA Walker. However, about two hours later, appellant told him that when he learned the aircraft would not pressurize, he helped conduct an inspection to determine the cause. Appellant told SA Tomlins that he had entered the crew's latrine to find the nose landing gear inspection window unsecured and hanging from one screw. The remaining screws were in the sink in the latrine. Tomlins further testified that appellant said he took the screws and simply closed the door with the idea of handling the matter "in-house." (R. 271)

SA Tomlins then testified appellant said that when the aircraft landed, he went to the latrine and replaced the screws in the window. Appellant also told him that when the aircraft inspection team could not find a cause for the inability to

8

pressurize the aircraft, he removed the screws and placed them in the trashcan.  At some later point, he walked into the latrine, took the screws out of the trashcan, and "show[ed] them to the maintenance . . . folks." (R. 272, 276)

— — — —

Appellant was found guilty of willfully damaging military property of the United States, i.e., a United States Air Force C-141B aircraft, by "causing the nose landing gear inspection window to be insecurely housed," in violation of Article 108, UCMJ.  (Charge Sheet at R. 7.1)  The President, in the Manual for Courts-Martial, has explained the elements of this offense as follows:

> 1.  That the accused, without proper authority, damaged. . .certain property in a certain way. . .;
>
> 2.  That the property was military property of the United States;
>
> 3.  That the damage. . .was willfully caused by the accused. . .; and
>
> 4.  That . . .the damage was of a certain amount.

Para. 32b(2), Part IV, Manual for Courts-Martial, United States (1995 ed.).[3]

---

[3]  The current version of this Manual provision is identical to the one in effect at the time of appellant's court-martial.

The initial question raised by appellant is whether there was sufficient evidence in this case that military property was actually damaged, as required by Article 108, UCMJ. In most cases, there is proof of visible damage to military property, such as a broken window in a military vehicle or building. However, a  physical breaking of the property need not always be shown. See United States v. Ortiz, 24 MJ 164, 170-71 (CMA 1987) (holding that disengagement of an electrical relay in an anti-skid system on an F-15 airplane was damage within meaning of Article 108, UCMJ).

In United States v. Peacock, 24 MJ 410, 411 (CMA 1987), this Court commented on the requirement for damage under Article 108, UCMJ, as follows:

> Criminal prohibitions against damage, loss, or spoliation of military property and stores have a long history in military law. See generally G. Davis, A Treatise on the Military Law of the United States 364 (3d ed. 1913); W. Winthrop, Military Law and Precedents 557-59 (2d ed. 1920 Reprint). In enacting Article 108, Congress intended to consolidate the various articles of war protecting military property and to eliminate certain technical distinctions between them. Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcomm. of the House Comm. on Armed Services, 81st Cong., 1st Sess. 1230 (1949). In doing so, it intended to continue to offer special protection to military property because of its function or role in the national defense. See United States v. Schelin, [15 MJ 218, 220 (CMA 1983)]. In light of the purpose of this statute, the word "damage" must be reasonably construed

> to mean <u>any change in</u> <u>the condition of the</u> <u>property</u> <u>which impairs its operational readiness</u>. <u>See</u> <u>United States v. Ortiz</u>, <u>supra</u>. Appellant's act of placing foreign objects in the fuel tanks impaired their utility to accomplish the mission of the Air Force just as much as if he had punctured these tanks or the tires of the aircraft which carried them.

(Emphasis added.)

In the present case, there was no evidence of permanent damage to the aircraft resulting from the removal of the screws from the nose landing gear inspection window. However, there was ample evidence that the removal of these screws before or during the flight of the plane led to its failure to pressurize and required the commander to terminate the military mission of the plane. This evidence was provided by the testimony of Major Bomar (R. 106-08), Sergeant Wallis (R. 208), and appellant's own admissions. Under <u>Ortiz</u> and <u>Peacock</u>, both <u>supra</u>, this was legally sufficient evidence to support his conviction under Article 108, UCMJ.

The second question raised by appellant is whether there was sufficient evidence showing that he was the perpetrator of the charged offense. There was no direct evidence establishing him as the perpetrator of this offense. No one actually saw him in the crew latrine removing the screws, and appellant made no statement admitting that he touched those screws, except as part of his discovery of the initial damage.

Nevertheless, there was evidence introduced in this case that the inspection window was secure when both the loadmaster and "scanner" checked it some forty-five minutes prior to the flight. It was also shown that appellant was on the aircraft, ostensibly preparing for the mission, during the period directly prior to takeoff, and he indicated to Sergeant Wallace that he would check the latrine for stowaways. Finally, appellant admitted that he "found" the screws that should have secured the windows, and he made inconsistent statements to the flight crew and the OSI as to what he then did with them. The variations in those statements could be viewed by the members as evidence of his consciousness of guilt. See United States v. Elmore, 33 MJ 387, 398 (CMA 1991). On this evidence and the inferences derived therefrom, a rational trier of fact could have concluded beyond a reasonable doubt that it was appellant who damaged the aircraft by removing the screws from the airplane window. United States v. Davis, 44 MJ at 18-19.

The third question raised by appellant is whether the evidence is legally insufficient because it fails to establish a motive for appellant to damage the airplane. Final Brief at 8. Appellant argues that the evidence in this case shows that only Sergeant Wallace, his fellow crewmember, had a motive to disable the plane, i.e., his desire to spend more time with a female passenger at the Yokota Air Base terminal. Id at 9. We disagree

that such an evidentiary argument rendered appellant's conviction legally insufficient.

Proof of motive may be relevant to the question of the identity of the person who does an act consistent with that motive.  See United States v. Whitner, 51 MJ 457, 460-61 (1999).  However, there is no legal requirement that the Government prove beyond a reasonable doubt that appellant had a motive to wrongfully damage military property in order to secure a conviction of this offense.  See Article 108, UCMJ; para. 32b(2), Part IV, Manual, supra.  Accordingly, the existence of evidence that another airman may have had such a motive to damage the military airplane did not establish the legal insufficiency of the case against appellant.  See generally Charles E. Torcia, 1 Wharton's Criminal Law § 89 at 610 (1993).

The decision of the United States Air Force Court of Criminal Appeals is affirmed.