IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
January 8, 2008 Session


STATE OF TENNESSEE  v.  KACY DEWAYNE CANNON


Appeal by permission from the Court of Criminal Appeals
Criminal Court for Hamilton County
No. 243913      Rebecca J. Stern, Judge


No. E2005-01237-SC-R11-CD - Filed April 29, 2008


GARY R. WADE, J., concurring.

I concur in the result reached by the majority, particularly the excellent analysis pertaining to the confrontation clauses of the federal and state constitutions; however, I would have affirmed that portion of the opinion by the Court of Criminal Appeals holding that the article of clothing containing semen identified as that of the defendant was properly admitted as evidence, despite any weakness in the chain of custody.  In my view, the majority places an inordinate degree of emphasis on the initial link in the chain and falls short of affording the trial judge adequate deference under our limited scope of review.  Because, however, other evidence offered by the State violated constitutional principles, and the errors were not harmless beyond a reasonable doubt, I agree that a new trial is warranted.

Rule 901(a) of the Tennessee Rules of Evidence requires the authentication of tangible evidence: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims."  If the proffered evidence is unique, readily identifiable, and relatively resistant to change, the foundation need only consist of testimony confirming its relevance.  It is when the evidence is susceptible to alteration that the trial court requires a more stringent foundation, entailing a chain of custody of the item with sufficient completeness to render it improbable that the original item has either been exchanged with another or has been subjected to tampering or contamination.  United States v. Cardenas, 864 F.2d 1528, 1531 (10th Cir. 1989).

Federal courts describe the "chain of custody" rule as "but a variation of the principle that . . . evidence must be authenticated prior to its admission" at trial.  United States v. Howard-Arias,

1

679 F.2d 363, 366 (4th Cir. 1982); see Fed. R. Evid. 901. The purpose of this threshold requirement is to establish that the evidence offered for admission is what it purports to be. Howard-Arias, 679 F.2d at 366. The ultimate question, as stated in Cardenas, is whether the authentication testimony was sufficiently complete so as to convince the trial court that it is *improbable* that the evidence has been substituted for the original or has otherwise been subjected to alteration. Id.; United States v. Brewer, 630 F.2d 795 (10th Cir. 1980). Precision in developing the "chain of custody" is not an ironclad requirement, and the fact of a missing link does not prevent the admission of real evidence, so long as there is sufficient proof that the evidence is authentic and has not been changed in any material aspect. Howard-Arias, 679 F.2d at 366 (citations omitted). The resolution of this question rests with the sound discretion of the trial judge. Id.

In setting up the chain of evidence, the prosecution is not required to elicit testimony from every custodian or every person who had an opportunity to come into contact with the evidence at issue. United States v. Harrington, 923 F.2d 1371 (9th Cir. 1991). Instead, the burden is on the prosecution to demonstrate that it is reasonably probable or reasonably certain that no tampering, alteration, or substitution has occurred. United States v. Ortiz, 966 F.2d 707 (1st Cir. 1992). Once the threshold of the admissibility has been met, any challenges to the chain of custody become considerations for the fact-finder. United States v. Lopez, 758 F.2d 1517 (11th Cir. 1985).

Other states besides our own tend to follow the path of the federal courts on chain of custody issues. For example, in Commonwealth v. Cugnini, 452 A.2d 1064 (Pa. Super. Ct. 1982), the Superior Court of Pennsylvania ruled that the Commonwealth need not produce every individual who came into contact with an item of evidence or otherwise eliminate every hypothetical possibility of tampering. Id. at 1065. That court held that a complete chain of custody is not required so long as the Commonwealth's evidence, direct and circumstantial, establishes a reasonable inference that the identity and condition of the exhibits have remained the same from the time they were first received until the time of trial. Id. Citing a line of other cases on the subject, the Pennsylvania court confirmed that "[a]ny gaps in testimony regarding the chain of custody go to the weight to be given the testimony, not to its admissibility." Id.

Similarly, the Supreme Court of Delaware has ruled that "[f]actors relevant in a chain of custody analysis include 'the nature of the article, the circumstances surrounding its preservation in custody, and the likelihood of intermeddlers having tampered with it.'" Whitfield v. State, 524 A.2d 13, 16 (Del. 1987) (quoting United States v. Gay, 774 F.2d 368, 374 (10th Cir. 1985)). My research suggests that this represents the majority view. In State v. Knuckles, 473 S.E.2d 131 (W.Va. 1996), for example, the Supreme Court of West Virginia adopted the rule in United States v. Howard-Arias:

> [T]he authentication requirement of the West Virginia Rules of Evidence requires only that a party introducing evidence demonstrate that the evidence is in fact what its proponent claims. W. Va. R. Evid. 901(a). The "chain of custody" rule is simply a variation of this principle and requires that a prosecutor seeking to introduce evidence must establish a chain of custody from the time the items were taken to show that they are in substantially the same condition as when they were seized.

2

Id. at 138 (citation omitted).

Further, in Martin v. State, 554 A.2d 429 (Md. Ct. Spec. App. 1989), the Maryland Court of Special Appeals followed the Pennsylvania guidelines, holding that "[w]eaknesses in the chain of custody affect the weight of the evidence rather than its admissibility." Id. at 433. In passing upon the admissibility of marijuana, the Maryland court ruled that the failure of one of the individuals who handled the evidence to testify at trial did not bar the admissibility of the illegal substance: "[The] facts lead us to conclude that the trial court was correct in admitting the evidence despite the failure of one person who had contact with the evidence to testify at trial." Id. at 434.

Here, the majority opinion properly identifies Rule 901(a) of the Tennessee Rule of Evidence as the applicable standard and identified the applicable precedent. In State v. Scott, 33 S.W.3d 746 (Tenn. 2000), however, this Court confirmed that Rule 901 did not require the identity of tangible evidence admitted through a chain of custody to be proved beyond all possibility of doubt or otherwise exclude every possibility of tampering. Id. at 760. So, when the State fails to call each and every witness within the chain of custody or the process is otherwise defective, tangible evidence may nevertheless be admissible if, in the discretion of the trial judge, the evidence has been adequately identified and "there was no substantial alteration . . . which would affect its validity." State v. Johnson, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). Before the admission or exclusion of the evidence offered, trial courts should consider its nature and all of the surrounding circumstances, "including presentation, custody and probability of tampering or alteration." United States v. Cardenas, 864 F.2d at 1531; see Reed v. United States, 377 F.2d 891, 893 (10th Cir. 1967). If these facts and circumstances reasonably establish the identity and integrity of the evidence within the discretion of the trial court, the evidence may be admitted. Id.; Neal P. Cohen et al., Tennessee Law of Evidence, § 901.12 (3d ed. 1995).

I interpret the opinion of the majority as requiring more than reasonable assurance in the chain of custody, particularly as to the first link. My colleagues express particular concern about the failure of the State to produce a witness who could testify definitively that the pantyhose were removed from M.N. and were properly secured until the arrival of the law enforcement authorities. Although I fully agree with the majority's observation that the State must "introduce sufficient evidence to reasonably establish a connection between the pantyhose and M.N.," I believe that may be accomplished through circumstantial evidence.

Indeed, no one testified that the pantyhose were removed from the victim and secured until the arrival of the authorities.[1] M.N. was dressed only in a hospital gown when the police arrived.

---

[1] Detective Dudley testified that M.N. used the word "underwear" in her statement instead of the word "pantyhose." The majority raises this point as a weakness in the chain of custody of the pantyhose; however, nowhere does the record suggest that there is any confusion. The list of exhibits included pantyhose. The Inventory of Property included pantyhose noted as "Added" with Detective Dudley's name following. The Evidentiary Chain of Custody Record mentions pantyhose. Although the lab analysis sheet is labeled "Underwear/Panties" the description includes "Silk Reflections, AB" and the drawing is of a pantyhose-like garment with long legs, indicating that it is typical in the

(continued...)

3

The emergency treatment by the attending physicians had been completed by the time Ardyce Redolfo, a specially trained nurse employed by the Sexual Assault Crisis Center, reached the hospital. Further, the medical records make no mention of the victim's clothing. M.N. was, however, the subject of the examination and confined to a room. Medical records confirmed that she was treated in the emergency room for injuries from the sexual assault. Nurse Redolfo, who conducted an independent examination, found bruises, abrasions, and a rectal tear and took blood samples. She testified that "[the pantyhose] were there [in the room] with her [other] clothes and no one else had been in the room except her . . . ." She recalled seeing a plastic bag containing the clothes and specifically determined that the pantyhose were wet in the bilateral groin area, an area which corresponded to the location of the wetness on the body of M.N. Dr. Brian Ingalls, the emergency room physician who treated M.N., described the protocol established by the hospital as a means of properly securing potential tangible evidence. A final step in the procedure included storing clothing in a plastic bag. While Dr. Ingalls was unaware of whether hospital personnel had deviated from the policy in this instance, that a standard procedure existed and the only testimony offered indicated compliance with that procedure tended to support the authenticity of the evidence. I can find no suggestion in the record of tampering of the pantyhose or any confusion about the item with any other article of clothing. There is no question about whether the evidence was properly preserved for analysis after the authorities took control of the pantyhose and until test results were presented at trial. Forensic experts from the TBI and Orchid Cellmark, an independent laboratory, confirmed that.

Thus, the examining physician, a nurse, and the detective conducting the investigation testified to circumstances that could have logically led to a conclusion that the pantyhose offered at trial belonged to M.N. and that she was wearing them at the time of the assault. The State established that the area of wetness in the pantyhose matched that on M.N.'s body. As stated, it is sufficient if the facts, whether direct or circumstantial, establish a reasonable assurance of the identity of the tangible evidence. Ritter v. State, 462 S.W.2d 247 (Tenn. Crim. App. 1970). Moreover, it is improbable that the pantyhose were exchanged with another or subjected to alteration. See United States v. Cardenas 864 F.2d at 1531; McCormick, Handbook on the Law of Evidence § 212 (3d ed. E. Cleary, ed. 1984). As indicated, the purpose of the chain of custody requirement is to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence. Scott, 33 S.W.3d at 760; see State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). It is only when the trial court has applied an incorrect legal standard or reached a decision which is against logic or reasoning that the appellate courts may intervene under the abuse of discretion standard and exclude the evidence. Scott, 33 S.W.3d at 752; State v. Holbrooks, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998). When the trial court ruled that the evidence had met the threshold requirement of reasonable assurance, the defendant was entitled to present a vigorous

---

[1] (...continued)
lab setting to equate pantyhose with the generic term "underwear." In our review of the various lab reports, the descriptions mention pantyhose, but nowhere did we find an indication of a separate undergarment other than pantyhose. Thus, it is a reasonable inference that M.N.'s use of the word "underwear," as reported by Detective Dudley, was a reference to pantyhose–rather than to some other undergarment.

cross-examination, testing the propriety of the chain and the credibility and competence of the witnesses who supported the admission of the evidence. The weight to be given the proof properly became a question for the jury.

I concur with the grant of a new trial, however, because the defendant was denied the right of confrontation as guaranteed by the United States and Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. The majority opinion provides an excellent summary of the applicable law, carefully reciting the developments in the law since the landmark decision in Crawford v. Washington, 541 U.S. 36 (2004). The first police officer to respond to the 911 call, Officer Damany Norwood, was permitted to testify to the contents of his initial interview with M.N. even though her statements were testimonial in nature. Absent any protection of the constitutional guarantee to the confrontation of the witness, her description of her assailant and her recitation of the nature of the attack should have been excluded. Davis v. Washington, 547 U.S. 813, 821-22 (2006). Similarly, Detective Charles Dudley questioned M.N. in the emergency room after she had been examined by medical personnel. The aim of the interrogation was to identify the rapist and the statements by the victim qualified as testimonial in nature. Because the defendant was denied the right to confront the witness who actually offered the testimony, the detective's testimony was inadmissible. Id. Finally, Nurse Redolfo, who worked with the law enforcement authorities in the investigation, questioned M.N. at length about the nature of the attack and a description of the rapist. She read the statement of M.N., clearly testimonial, to the jury. In essence, the testimony of Redolfo was substituted for that of M.N. and served as important corroboration of the DNA test results. That violated the right of confrontation under Crawford and its progeny. See Davis, 547 U.S. at 821-22. Because the jury is entitled to consider the weight and value of the DNA analysis in the context of all of the other evidence offered at trial, much of which should have been excluded, I could not hold that its admission in violation of the right of confrontation was harmless beyond a reasonable doubt, as did the Court of Criminal Appeals. See Chapman v. California, 386 U.S. 18 (1967); State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006); State v. Howell, 868 S.W.2d 238, 259 (Tenn. 1993).

Accordingly, I join with the majority of the Court in the reversal of the conviction and the grant of a new trial.

 

_____
GARY R. WADE, JUSTICE